Dueeee, Judge,
delivered the opinion of the court:
Plaintiff sues for an amount allegedly due on a contract for the manufacture of duffel bags for the Army. The defendant does not deny that it is indebted to the plaintiff on that contract, but it has asserted a counterclaim based on damages allegedly due raider an earlier but similar manufacturing contract which, if judgment is entered thereon, would leave a net amount owing the defendant.[1]
The first contract in point of time, DA-30-280-Q,M-3833 (hereinafter referred to as Contract 3833), was awarded to plaintiff on June 16,1950, pursuant to his bid of 47 cents per duffel bag on 190,000 units. The bids were opened on June 2, but there is no evidence that plaintiff had received notifica *168 tion that he was the successful bidder prior to June 17, the date on which he wrote to the contracting officer stating that he had made a mistake in his unit bid price. Subsequently, the plaintiff submitted cost estimates to the contracting officer to support his contention that he had seriously underestimated costs in bidding on the contract. In due course, after considering the information supplied by the plaintiff, the contracting officer notified him that he believed the plaintiff’s bid was not only unusually low as compared with the figures quoted by other bidders, but that the price was totally inadequate. It was his recommendation that the plaintiff should be relieved of his obligation to perform the contract.
However, in November 1950, the Comptroller General advised the Secretary of the Army that he found no legal basis for increasing the consideration or for releasing the plaintiff from his obligation to perform under Contract 8883. The plaintiff was subsequently advised by the contracting officer that unless assurances of performance of the contract were furnished by January 15, 1951, action would be taken to terminate the contract. Apparently, no such assurances were given and on January 17, 1951, the contracting officer terminated the contract under the authority of the default article. He specifically asserted that the Government reserved its right to repurchase the terminated quantities and hold the plaintiff liable for excess costs.
On June 1, 1951, the defendant executed a number of contracts to secure replacements for the duffel bags which were not manufactured under Contract 3833. It attempted to assess plaintiff for the excess costs incurred in re-letting the work, but the Armed Services Board of Contract Appeals (ASBCA) held that the repurchases were not made within a reasonable time after the notice of termination and, therefore, were not made pursuant to the default article of the contract and could not be assessed against the plaintiff. Nevertheless, the contracting officer continued to assert a claim for excess costs against plaintiff and in November 1953, the General Accounting Office issued a settlement against him in the net amount of $15,665.44 after allowing an offset for the amount the Government owed under a later duffel bag contract, DA-30-280-QM-12130 (hereinafter referred to as *169 Contract 12180), which, contract is the one sued on by plaintiff in this action.
The position of the defendant as to its counterclaim, is that Contract 3833 was a valid contract which was breached by the plaintiff. Although the defendant accepts the ASBCA holding that it waited too long in making the repurchases to attempt to assert them as excess costs under the contract, it insists that the terms of the contract preserve its common law right to damages for breach of contract. It suggests what it believes is a fair measure of damages but, inasmuch as the plaintiff is insolvent, it asks to be awarded only so much as is necessary to offset any judgment the plaintiff might be awarded under Contract 12130.
The plaintiff, on the other hand, takes the position that a serious, bona fide error was made in the bid price on Contract 3833 of which the defendant had knowledge and, as a result of which no binding contract came into being. Alternatively, he argues that the termination action of the contracting officer amounted to a rescission of the contract which precluded the defendant from thereafter asserting a claim based on a theory of breach of contract.
To determine the final position of the parties vis-a-vis each other, we must decide whether the defendant has a valid claim for common law contract damages on Contract 3833 and, if so, how those damages are to be measured.
A consideration of whether the contract was breached, as the Government contends, cannot begin without a discussion of plaintiff’s contention that no enforceable contract existed. Though it is quite possible that plaintiff made a miscalculation in arriving at his bid price, it is not at all clear that this error was so gross and so manifest as to have necessarily and immediately indicated to the contracting officer a mistake fatal to a meeting of the minds.
Three bidders in addition to the plaintiff submitted bids of less than 60 cents per unit for all or some of the delivery points. While some of the unit bid prices were as high as two dollars and higher, more than 50 percent of the bids was one dollar or less. And so we see not a group of price quotations concentrated at or near a certain figure with the plaintiff’s price standing alone far below this point, but a *170 widespread distribution of estimated prices of which plaintiff’s price is the lowest.
When plaintiff first made a complaint about his bid price in the letter of June 17, 1950, he requested only a three-fourths of a cent increase in the unit price, apparently based on the change in packing requirements, but he did not attempt to withdraw from the contract. Even on June 24, 1950, when he furnished the contracting officer with additional information, he requested an adjustment in unit price to 54 cents, an increase over the original bid price of only seven cents.
Under these circumstances we do not feel that the contracting officer was on notice of a unilateral mistake, so demonstrably gross that awarding Contract 3833 to the plaintiff at that price amounted to an attempt to take unconscionable advantage of the error.
There is less reason for us to hesitate on the question of whether the plaintiff was in breach of Contract 3833. Following a number of conferences between the parties concerning adjustments in the contract, plaintiff wrote the contracting officer on December 28,1950, indicating a reluctance to perform. The contracting officer replied that he interpreted the letter as a refusal to perform. He rightfully excused the defendant’s failure to supply government-furnished-property in view of the plaintiff’s position. In refusing to perform the plaintiff was clearly in default of the contract under circumstances amounting to a breach. Plaintiff has not challenged the ASBCA determination sustaining the contracting officer’s notice of termination and his determination that the default resulted from causes within plaintiff’s control. Though we are not necessarily bound by the administrative determination which amounted to a holding that plaintiff was guilty of a breach, we think that the fact of plaintiff’s refusal to perform cannot be interpreted in any other way.
The defendant’s contracting officer did not rescind the contract, as suggested by the plaintiff. Rescission contemplates a return by the parties to the status quo. Unlike the typical rescission where both contracting parties are rid of the obligations imposed by a contract, the defendant did *171 not wish, to dissolve the contractual ties; rather, it wished to hold the plaintiff to the agreement which had been made. The default for which the defendant terminated the contract was not a mere matter of convenience freeing both parties from an undesirable contract relationship. It was a termination forced bj the plaintiff’s breach of his obligation to perform under the contract.
Ultimately, then, plaintiff is faced with an enforceable contract which will not be performed because of his breach and not as a result of any act of rescission. The defendant acquiesces in the ASBCA decision that the repurchases for Contract 3833 were not made in such reasonable time as would permit it to assert excess costs against the plaintiff. However, the defendant insists that it has a common law right to damages for breach of the contract, measured by the difference between the contract price and the reasonable replacement cost of the contract items, in addition to its specific contract remedies.
Although the remedy provided for in clause 11 (c) namely, the recovery of excess costs, was lost by the defendant because of its tardiness in re-letting the contract, clause 11(f) tells us that “[t]he rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.”
We think that this contract provision reserved to the defendant any common law remedies which it may have had, at the same time recognizing the right to' assert claims for excess cost under clause 11(c). In point of fact, all that provision 11(c) does is to take a common law rule for determining damages for breach of contract, the difference between the contract price and the reasonable cost of obtaining performance after the breach, and say that if- the Government repurchases within a reasonable time, the repurchase price will be accepted as the reasonable cost of obtaining performance with no further proof required.
Though the defendant may not now satisfy its burden of proving damages merely by showing what was the unit price on the re-letting of Contract 3833, we think that it should be given the opportunity to show, as a matter of common law *172 contract damages, bow much tbe cost of obtaining performance was increased as a result of the plaintiff’s breach. The record discloses sufficient evidence on which we may project a unit bid price which would represent the reasonable cost in the market of obtaining the items originally covered by Contract 8883. Between May 4,1950, the date on which the plaintiff submitted its bid on Contract 3833, and June 1,1951, the date on which the defendant entered into the replacement contracts, a number of duffel bag contracts, in addition to the replacement contracts, were entered into by the defendant. Ordinarily, there was from one to two months’ elapsed time between invitations to bid and the awarding of the contracts. The May 1950, to June 1951, period was one of steadily rising costs and bid prices. In September 1950 the successful bidders had bid as low as 47 cents per unit. By March 1951, successful bidders were bidding as high as 68 cents. The plaintiff himself received a contract for 50,000 units in April 1951 at a unit price of 68 cents.[2]
The bids submitted in mid December 1950, approximately one month before termination, averaged 53 cents per unit. The bids submitted in mid March 1951, approximately two months after termination, averaged 66 cents per unit. Both average figures include bids for export as well as domestic supply. If we assume that a reasonable date for requesting bids was immediately after the termination, to wit, mid-January 1951, and if we assume that bid prices rose uniformly between December and March, we arrive at an average unit price for mid-January of 61.7 cents. At that unit price, the cost of securing replacement items for the 190,000 units of Contract 3833 is $117,230. This figure is $27,930 more than the total price of the breached contract and represents the amount due the defendant on its counterclaim.
However, the defendant has only requested judgment on its counterclaim to the extent required to offset any judgment awarded the plaintiff on his principal claim, inasmuch as the plaintiff is insolvent and the defendant does not expect to be able to satisfy any net judgment which it might receive. In *173 the circumstances of this case, we think that the Government’s request is reasonable and will result in substantial justice to both parties.
Accordingly, the plaintiff is entitled to recover the amount of $12,840 on its claim based on Contract DA-30-280-QM-12130. The defendant is entitled to recover a like amount on its counterclaims based on Contract DA-30-280-QM-3833 and Contract DA-30-352-TAP-1904. These amounts offset each other and thus no net judgment will be entered in favor of either party.
It is so ordered.
Laeamoke, Judge-; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff George S. Rumley is, and at all times herein material was, an individual doing business as George S. Rumley Shoe Manufacturing Company, located at 15 Hol-yoke Street, Lynn, Massachusetts.
2. Plaintiff sues to recover $12,840 withheld by the defendant on contract No. DA-30-280-QM-12130 (hereinafter referred to as QM-12130).
In its answer and counterclaim the defendant admits that the said sum of $12,840 was withheld from the plaintiff and applied to offset, in part, other money owed by plaintiff to the defendant. The defendant’s counterclaim is for $28,-505.44 on contract No. DA-30-280-QM-3833 (hereinafter referred to as QM-3833), and $1,143.19 on contract No. DA-30-352-TAP-1904 (hereinafter referred to as TAP-1904).
3. On February 8, 1951, the New York Quartermaster Procurement Agency issued request for proposal QM 30-280-51-Neg. 324, with opening of bids February 23, 1951, for 1,195,640 duffel bags, domestic pack, for the United States Air Force, with delivery at Shelby, Ohio. Bids were received on the following quantities:
*174 Bidder Quantity Price
Harry Brill, Inc., Brooklyn, N.Y__.... 250,000 1.703
Bunny Bear, Inc., Everett, Mass.. 70,000 .90
Burlington Mills, Burlington, Wis.. 105,000 .835
Oamel Mfg. Co., Knoxville, Term... 600,000 .623
Concord Supplies & Equipment Oorp., New York, N.Y. all .765
Daval Handbags, Inc., Perth Amboy, N. J.. 200,000 .79
Double Protection Awning Co., Miami, Fla.. 275,000 .77
Fraser Products Co., Alpena, Mich... 500,000 . 95578
Hall Bros., New York, N.Y-500,000 .77
Irving Stitching Co., Lowell, Mass_ all .75
ISew England Production Corp., Bridgeport, Conn.. all .659
The Schoellkopf Co., Dallas, Tex.... 300,000 .765
Swank, Inc., Attleboro, Mass___ 100,000 .96
Spokane Tent & Awning Co., Spokane, Wash_ 165,000 .84
Upland Mfg. Co., Upland, Ind — .. 90,000 . 265
Wall Street Luggage Mfg. Co., Philadelphia, Pa.. 50,000 .5966
The bid of the Wall Street Luggage Mfg. Co. was rejected because it had ashed to subcontract the work on a previous contract for duffel bags. None of the above bids was accepted, but the following contracts were negotiated:
Contractor and contract number Quantity unit price Amount
George S. Rumley Shoe Mfg., No. DA-30-280QM-12130------200,000 $0.60 $120,000.00
Jefferson Textile Company, No. DA-30-280-QM-12131. — -.—.—. 200,000 .622 124,400.00
V. P. Rathburn, No. DA-30-280-QM-12132. 00,000 .66 69,400.00
Sidney Braun Oorp., No. DA-30-280-QM-12133-260,872 dom. .679 177,132.08
239,128 exp. .689 164,759.19
Hall Bros., No. DA-30-280-QM-12134.. 205,640 141,890.60
Except for accessories and findings, all material was furnished by the defendant, and is sometimes referred to as GFP (Government-furnishedproperty).
By supplemental agreement, Modification 4, dated June 17, 1952, plaintiff’s contract was amended to provide for the delivery of only 82,960 units at $0.60, or the sum of $49,776.
On October 16, 1951, the plaintiff delivered 10,400 duffel bags and on November 10, 1951, plaintiff delivered 11,000 duffel bags, for which he claimed $12,840 on duly-rendered vouchers. The amount of $12,840 was withheld by the defendant and offset against excess cost to the Government on contract QM-3833 hereinafter described.
DEFENDANT’S COUNTERCLAIM ON CONTRACT QM-3833
4. On May 4, 1950, the New York Quartermaster Procurement Agency, Department of the Army, issued an invi *175 tation for. bids for the manufacture of 250,000 duffel bags and delivery f.ob. various points designated in the bid proposal, bids to be opened June 2, 1950. Except for accessories and findings, all material was to be furnished by the defendant. Specification MIL-B-829A for the manufacture of the bags, as well as the provisions of the contract to be awarded, accompanied the invitation for bids. The bid proposal specified an allowance of 80 days from the date of opening for the acceptance of any or all of the items upon which prices were quoted.
The plaintiff submitted a bid dated May 24, 1950, for the entire quantity of 250,000 duffel bags at $0.47 each, and was awarded contract QM-8833 on June 16, 1950, at the bid price of $0.47 for 190,000 of the quantity required. The bid schedule and quantities awarded are set out in the following tabulation:
Designated shipping points Bid schedule Awarded in contract

Packed for domestic shipment

a. Atlanta General Depot_ 26.250 19,940
b. Columbus General Depot_ 35,000 26,600
c. Utah General Depot__ 17,500 13,280
d. Auburn General Depot... 17,500 13,320
e. Richmond Quartermaster Depot.. 36.250 27,560
f. Ft. Worth Quartermaster Depot.. 36,250 27,560
g. Schenectady General Depot_ 18,750 14,260

Packed for overseas shipment

h. Atlanta General Depot_ 17,500 13,300
i. Sharpe General Depot_ 27,600 20,880
j. Schenectady General Depot-17,500 13,300
Totals__ 250,000 190,000
Total values at $0.47 each. $117,500 $89,300
5. Prior to the opening of bids, the defendant transmitted to prospective bidders Addendum No. 1, dated May 8,1950, which amended the invitation for bids by a change in packing of items “a” through “g” from domestic shipment to overseas shipment, and provided that three copies of Addendum No. 1 be executed and attached to the bid submitted or, if the bid had been submitted, that the same be mailed separately. The plaintiff signed the Addendum, dated June 12,1950, and mailed it as directed.
6. Pertinent provisions of the bid which were incorporated into the contract are as follows:
*176 Item No. Supplies or Services Quantity (number of units) Unit Unit price
1. BAG, DUFFEL
STOCK NUMBER: 74-B-54-55
SPECIFICATION: SHALL BE AS INDICATED IN PARAGRAPH F,
PAGE NO. 3
DESTINATIONS_Shipping addresses — Pages 8 and 7

THE FOLLOWING ARE TO BE PACKED FOR DOMESTIC SHIPMENT:

a. Atlanta General Depot_ b. Columbus General Depot_ c. Utah General Depot_ d. Auburn General Depot_ e. Richmond Quartermaster Depot.. f. Ft. worth Quartermaster Depot.. g. Schenectady General Depot_

THE FOLLOWING ARE TO BE PACKED FOR OVERSEAS SHIPMENT:

h. Atlanta General Depot_ i. Sharpe General Depot.. ]. Schenectady General Depot.. 10.47 .47 .47
Other pertinent provisions of the bid later incorporated into the contract are as follows:
Availability Schedule for Government Furnished Material. — Bidder will furnish shipping instructions for shipment of Government Furnished Property within forty-eight hours after receipt of Notice of Award. Upon receipt of such instructions, the Government will deliver the material as follows:
BID
In compliance with the above, the undersigned offers and agrees, if this Bid be accepted within 30 * * calendar days (60 calendar days unless a different period be inserted by the bidder) from the date of the opening, to furnish any or all of the items upon which prices are quoted, at the price set opposite each item, delivered at the designated point (s) and within the time specified in the Schedule accompanying the above Invitation for Bids. * * ALLOW A MINIMUM OF 30 DAYS FOE THE ACCEPTANCE OF THIS BID.
$ ‡ ‡ ‡ ‡
1. Award. — The right is reserved, as the interest of the Government may require, to reject any or all bids and to waive any minor informality or irregularity in bids received. The Government may accept any item or group of items of any bid unless qualified by specific limitation of the bidder. UNLESS OTHEEWISE *177 PEOVIDED IN THE SCHEDULE, BIDS MAY BE SUBMITTED FOE ANY QUANTITIES LESS THAN THOSE SPECIFIED; AND THE GOVEENMENT EESEEVES THE EIGHT TO MAKE AN AWARD ON ANY ITEM] FOE A QUANTITY LESS THAN THE QUANTITY BID UPON AT THE UNIT PEICE OFFEEED UNLESS THE BIDDEE SPECIFIES OTHEEWISE IN HIS BID. The contract shall be awarded to that responsible bidder whose bid, conforming to the Invitation for Bids, will be most advantageous to the Government, price and other factors considered. An award mailed {or otherwise furnished) to. the successful bidder within the time for acceptance specified in the bid results in a binding contract without further action by either party.
*****
10. Bids. — * * *
(d) Mistake. Bidders are expected to examine the drawings, specifications, circulars, Schedule, and all instructions pertaining to the supplies or services. Failure to do so will be at the bidder’s risk. In case of mistake in extension of price, the unit price will govern.
sfc H* ❖ * *
(h) Withdrawal. Bids may be withdrawn by written or telegraphic notice provided such notice is received prior to the time set for the opening of the bids.
*****
11. Default
(a) The Government may, subject to the provisions of paragraph (5) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:
(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or
(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the Contracting Officer specifying such failure.
(5) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negli *178 gence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.
(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, Provided, That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.
*****
(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause} it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (5) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled “Termination for Convenience of the Government,” and the rights and obligations of the parties hereto shall in such event be governed by such clause. (Except as otherwise provided in this contract, this paragraph (e) applies only if this contract is with a military department.)
(/) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.
12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the *179 decision of tbe Secretary or bis duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
7. The bids were opened June 2,1950, at a public meeting to which bidders, news reporters, and other interested persons were admitted. The plaintiff was low bidder on nine of the ten designated delivery points. The E. A. Brown Manufacturing Company bid $0.4688 for delivery at Ft. Worth, Texas, but, when adjusted for the cost of the delivery of GFP to this bidder’s plant at Dodge City, Kansas, as compared with such cost to Lynn, Massachusetts, this bid exceeded plaintiff’s bid of 47 cents. The E. A. Brown Manufacturing Company bid on only three items of the delivery points. The three lowest unit bids, other than that of plaintiff, are compared in the following table for designated deliveries:
Delivery designation Brown Co., Dodge City, Kans. Dumas Co., Miami, Fla. Camel Co., Knoxville, Tenn.
a. Atlanta___ $0.56485 10.5877
b. Columbus___ .56825 .5877
c. Utah___ $0.4890 .57081 .5877
d. Auburn. .4890 . 67081 .5877
e. Richmond... . 56485 .5877
f. Ft. Worth.. .4688 .53268 .5877
g. Schenectady_ . 57081 .5877
h. Atlanta...... .56535 .6877
i. Sharpe.. . 57131 .5877
j. Schenectady... . 57131 .5877
Average (incomplete).. .56314 .5877
There were 61 bids submitted, of which three entered no price. All other bids were at the unit price of 60 cents or above. Considering variations in prices for different points of delivery, all other bidders would fall into the approximate groups as follows: Six in the 60 to 70 cents price, four in the 70 to 80 cents price, five in the 80 to 90 cents price, thirteen in the 90 cents to $1 price, eleven in the $1 *180 to $1.25 price, four in tbe $1.25 to $1.50 price, five in the $1.50 to $2 price, and six bids were over $2 per unit.
8. Following the opening of bids on June 2, 1950, plaintiff made inquiries of suppliers for quotations on the accessories, also freight and insurance, to points of delivery. The contract was awarded plaintiff June 16, 1950, and, under normal administrative procedure, it should have been mailed out the same day. The record does not establish that it was mailed to plaintiff on June 16, or that plaintiff had received it on June 17, 1950, when he wrote the contracting officer that errors had been made in his bid.
9. In plaintiff’s letter of June 17, 1950, to the contracting officer with reference to errors in his bid it was stated that there should have been a letter accompanying Addendum No. 1 which he signed and submitted June 12,1950, and that the additional cost of packing for overseas shipment was estimated at .0075 cents per unit. Other unit costs were reported at 6.5 cents for the grommets, 9.3 cents for the keeper and snap, 2.5 cents for baling, 2 cents for thread and needles, and 18.5 cents for labor. Freight costs were reported at approximately 20 cents per unit to Ogden, Auburn, and Sharpe General Depots, and 11 cents to the Fort Worth Depot. Plaintiff also requested that orders for deliveries to these points be given to the A. E. Brown Company, and stated he would be glad to take the others with an adjustment for overseas packing, estimated at .0075 cents additional cost. Plaintiff’s letter also contained the following statement:
* * * I realize that I didn’t take into consideration the weight of the duffel bag when placing my bid. I figured that it would weigh less than one pound but it weighs between two and a half and three pounds this makes a big difference when your rate is .0665 per pound and this is where I made my mistake. * * *
10. The specifications furnished bidders required the use of No. 8 cotton duck for the bottom and chafing band of the duffel bag with a minimum weight of 17.55 ounces per square yard, No. 10 cotton duck for all other canvas parts with a minimum weight of 14.35 ounces per square yard and 2-inch webbing of 2.65 ounces per linear yard.
*181 11. After plaintiff received the award of the contract, lie engaged in numerous conferences, telephone conversations, and correspondence with the contracting officer in efforts to obtain relief from the contract or to obtain an adjustment in the price by reason of mistakes in his hid.
Existing applicable regulations at the time provided that when a contracting officer determined that there was an obvious mistake in a bid the bidder was authorized to make the correction or was asked to submit a confirmation of the bid. This procedure was not followed in the initial consideration of plaintiff’s bid apparently because as of that time no determination had been made by the contracting officer that there was an obvious error in the bid.
By letters of July 17 and 24, 1950, plaintiff submitted comparative statements of his original and revised costs, and requested that an adjustment be made in the contract price to $0.54 per unit to cover his estimated costs, or that he be relieved of the contract entirely. Plaintiff also contended that his original labor estimate was erroneous in that he had neglected to figure the reinforcement on the bottom of the bag which was estimated at additional labor cost of 5 cents per unit.
Plaintiff was finally requested to document his proof of mistakes and the contracting officer agreed to submit such proof, along with plaintiff’s request for relief, to the Quartermaster General and to the Comptroller General in accordance with existing regulations.
12. On September 7,1950, the successor contracting officer wrote the Quartermaster General in respect to plaintiff’s alleged mistakes in the preparation of his bid.
This letter stated, in part, as follows:
10. With specific reference to the mistake in computing the freight charges there is inclosed as exhibit #4, a computation made by the Cost & Price Analysis Section of this office showing that contractor erred in its freight charges to the extent of $5,956.12.
11. From review of the contractor’s figures it would appear that his operations on subject contract would be at a loss to the contractor. Furthermore, from a review of the abstract of bids it appears that subject contractor’s bid was unusually low.
*182 15. The Government received 62 bids on its invitation for subject item and in the highly competitive market which then existed the contracting officer could not unequivocally know that the bid prices of the George S. Rumley Shoe Mfg. Co. and bidder #50, E. A. Brown Mfg. Co. were so much out of line as to make it unconscionable that such bids be accepted. Almost immediately after making the award, the contractor brought to the attention of the contracting officer the facts to show that the unit price of $.47 was totally inadequate. The substantially higher prices bid by the remaining 60 bidders indicates that the more normal price range was $.58 and up. Figures as of June 1950 from the Philadelphia Quartermaster Depot’s Manufacturing Division showed the labor and material costs for this item to be $.7033. It is known, however, that Government manufacturing costs may be as much as 25% or 30% higher than costs incurred by commercial firms.
16. It is the carefully considered opinion of the Successor Contracting Officer that under all the. facts and circumstances, the Government should allow the contractor to be relieved of its obligation under Contract DA 30-280-qm-3833.
Allowing an excess cost estimate of 25 percent in the defendant’s labor and material costs of $0.7033 over and above the manufacturing cost of a commercial firm, such cost would be $0,563 per unit. In addition, the freight costs to several of the more distant f .o.b. delivery points amounted to approximately 20 cents per unit, and would average in excess of 10 cents per unit.
13. By opinion No. B-98565, dated November 8, 1950, to the Secretary of the Army, the Comptroller General held that, on the basis of the facts and evidence of record, (1) it did not appear that plaintiff’s bid was other than as intended at the time of the opening thereof, (2) it did not appear that the contracting officer was, or should have been, on notice of the probability of an error in the bid, and (3) the acceptance of the bid was made in good faith. The opinion concluded as follows:
* * * I find no legal basis for increasing the consideration specified in contract No. DA-30-280-QM-3833, or for relieving the contractor from its liabilities under the terms of the said contract.
*183 By letter of November 30, 1950, the contracting officer advised plaintiff of the decision of the Comptroller General and requested advice immediately as to the action plaintiff intended to take in the performance of the contract.
14. On December 28, 1950, plaintiff wrote the contracting officer, again requesting cancellation of contract QM-3833, and stated: “Up to the present I have not heard from my attorney who has taken this matter up with the Comptroller General, requesting cancellation of this contract.”
In this letter plaintiff also stated that the 'snap fastener and keeper first quoted at 9 cents a set were, as of the date the letter was written, selling at 12.75 cents, and further alleged that the defendant breached the contract for failure to deliver any GFP required in the production of the duffel bags.
15. By letter of January 5, 1951, the contracting officer wrote plaintiff as follows:
Receipt is acknowledged of your letter dated 28 December 1950 concerning Contract DA 30-280-qm-3833. If this Office correctly understands your said letter to be a refusal to perform, the only recourse for the Government will be to terminate for default, under the “Default” article of your contract, reserving all rights thereunder, including the right to repurchase the item, charging to your account any excess costs therefor.
Careful note has been made of your allegations regarding Government-Furnished-Property not being furnished to you. Almost immediately after you received the award of Contract DA 30-280-qm-3833 you indicated that you would not perform unless an increase in price were given to you and you requested that the contract be held in abeyance, pending decision as to whether the contract price would be increased. It is well settled that one party to a contract cannot be held to strict accountability when the expressed attitude of the other party indicates that performance would be a useless act.
While the circumstances of your case are understood, it is regretted that unless positive assurances of performance are received by 15 January 1951, action will be taken to terminate your contract for default.
16. By letter of January 17,1951, the plaintiff was notified by the contracting officer that the contract was terminated *184 in its entirety for default. This letter also contained the following statement:
It is the determination of the Contracting Officer that your failure and refusal to perform this contract did not arise out of causes beyond your control and without your fault or negligence, within the meaning of the Default Article, and therefore, the Government hereby reserves all its rights under subject contract, including the right to repurchase the terminated quantity in such manner as the Contracting Officer may deem appropriate, holding George S. Rumley Shoe Manufacturing Co. liable to the Government for any excess costs incurred thereby.
The plaintiff made timely appeal from the determination of the contracting officer in respect to the termination of contract QM-3833 and this appeal was docketed by the Armed Services Board of Contract Appeals as ASBCA No. 799.
In a decision issued September 12, 1952, the ASBCA denied plaintiff’s appeal and sustained the determination of the contracting officer that plaintiff’s contract was terminated by default in performance on the part of the plaintiff.
17. On April 4, 1951, the defendant issued an invitation for bids for the repurchase of 190,000 duffel bags under plaintiff’s defaulted contract QM-3833.
Bids were accepted from the following-named firms and contracts were entered into with them June 1, 1951, at the replacement contract prices totaling $152,349.12:
Contractor Units Delivery Price Amounts
Mitchell Shoe Co___. 33.240 Atlanta_ $0,789 $26,226.36
Ohesterbrooke Co.... 26,600 Columbus.... .765 20,349.00
Canvas Products Co. 13,280 Utah_ .875 11,620.00
Canvas Products Co. Ohesterbrooke Co.... 13.320 27.660 Auburn.. Richmond... .876 .76 11,666.00 20,670.00
Canvas Products Co. 27.660 Ft. Worth_ .844 23,260.64
Canvas Products Co. 20,880 Sharpe_ .875 18,270.00
Mitchell Shoe Co.... 20,760 Schenectady. .737 16,300.12
Ohesterbrooke Co.... 6,800 Schenectady. .735 4,998.00
Totals.. 190,000 152,349.12
18. In addition to the contracts for the replacement of 190,000 duffel bags listed in the preceding finding and contracts awarded plaintiff and other firms on March 7, 1951, the defendant also awarded other contracts for duffel bags *185 during the period from May 4,1950, to June 1,1951, on invitations to bid as follows:

Contract (18), QM-15204, was awarded to the plaintiff, and all other contracts listed above were awarded to other firms.
The contracts listed in this finding were all awarded at rates for f.o.b. origin of manufacture. The freight rates on deliveries to points of destination designated in plaintiff’s contract QM-3833 averaged in excess of 10 cents per unit.
19. On September 10, 1951, the successor contracting officer submitted a claim against plaintiff on account of excess costs to the defendant on defaulted contract QM-3833 as follows:
Cost of repurchase_$153, 661.16
Original price under QM-3833_ 89,300.00
Excess cost_ 64,361.16
Cost of transportation of GFP, etc_ 1,760.44
Total_ 66,121.60
The letter stated, in part: “Please be further advised that the above constitutes a finding of fact and determination by the undersigned.”
*186 Timely appeal was taken by plaintiff from the determination of the contracting officer for excess costs under plaintiff’s contract QM-3833, and this appeal was docketed as ASBCA No. 1009.
20. Thereafter, on December 7, 1951, the successor contracting officer submitted to plaintiff an amended determination of excess costs of $29,670.07 under defaulted contract QM-3833. The contracting officer determined that the purchase of replacement duffel bags under QM-3833 should have been made at an earlier date than June 1,1951, and that the procurement under request proposal QM 30-280-51-Neg. 324, for which bids were received for opening February 23, 1951, “represents a procurement of this item within a reasonable time * * The plaintiff was awarded contract QM-12130 for the delivery of 200,000 units at 60 cents each, f.o.b, Shelby, Ohio, and it was the determination of the contracting officer that “said price [in contract QM-12130] is fair and reasonable and represents the lowest possible cost at which repurchase could have been made,” as adjusted in the following tabulation:
190,000 units at $0.60_ $114, 000.00
Less freight to Shelby, Ohio- 12, 019. 88
—- $101,980.12

Less:

190,000 units at $0.47 in QM-3833_ 89, 300.00
Less freight to various points- 19,366. 98
- 69, 933.02
_ 32,047.10 Excess costs based on f.o.b. Lynn, Mass.

Less freight differential:

19, 366.98 Lynn to various destinations-
13,709. 51 Freight on replacements_
- 5,657.47
Excess costs other than adjustment for packing for export and freight on GEP_ 26, 389. 63

Add:

Difference in cost of packing for domestic deliveries
and for export under QM-3833_ 1, 520.00
Difference in cost of shipping GEP to replacement contractors at various locations over such costs to
Lynn, Mass., under contract QM-3833_ 1, 760.44
Total excess costs in the amended determination. 29,670.07
*187 21. On September 12, 1952, the Board sustained plaintiff’s appeal under ASBCA No. 1009 on the assessment of excess costs under defaulted contract QM-3833. The Board agreed with the contracting officer that the repurchases made June 1, 1951, were too late and did not furnish a proper basis for the assessment of excess costs. The Board found that the amended determination of the contracting officer December 7, 1951, for excess costs of $29,670.07 was not made pursuant to the default article of the contract. The decision of the Board states, in part:
* * * This finding was not made pursuant to the “Default” article since the determination and assessment of excess costs may be made only if the Government’s action has been proper.
if: if: # if: *
We are not convinced that competitive bids and general market conditions on 23 February 1951 are relevant in determining the extent of any supposed liability of the appellant to the Government. However, we will not review the action of the contracting officer which was purely administrative and not supported by any contractual authority.
On February 13,1953, the Board sustained its decision on a motion for reconsideration by the defendant.
22. On October 8, 1952, the contracting officer advised plaintiff that the difference in cost of shipping GFP to the various replacement contractors over the cost of shipping same to plaintiff’s plant at Lynn, Massachusetts, was only $595.81, instead of the charge estimated and previously determined at $1,760.44, and that the excess cost for repurchases against QM-3833 was, accordingly, adjusted to $28,-505.44.
The General Accounting Office issued settlement No. US-79619 November 2, 1953, against plaintiff for the net sum of $15,665.44 after the offset of $12,840 otherwise on contract QM-12130.
23. The defendant now claims that the excess costs of repurchases on contract QM-3833 should be increased by $3,185.93 and the total excess costs should be $31,691.37.
Freight charges on the replacement deliveries reported in finding 17 were recomputed from the shipping docu *188 ments at $16,895.44, instead of the cost previously determined at $13,709.51 shown in finding 20, and the credit for the freight differential would be $2,471.54, instead of the allowance previously determined at $5,657.47.
DEPENDANT’S COuNTERCLAIM: ON CONTRACT TAP-1904
24. On May 26, 1953, plaintiff was awarded another contract, TAP-1904, for the manufacture of 144,600 barrack bags for delivery during August and September 1953. The contract provided, in part:
The Government will endeavor to make initial delivery of Government Furnished Material to the contractor at least 75 calendar days in advance of the last day of the month in which the first deliveries are due. Each such delivery period will be extended by the number of calendar days that the_ initial delivery of Government Furnished Property is delayed.
25. On June 17, 1953, the defendant shipped the first lot of GFP to plaintiff at Lynn, Massachusetts, on requisition of June 9, 1953, from the Philadelphia Quartermaster Depot. Upon the receipt of the Government bill of lading on June 19, the plaintiff sent the following telegram to the contracting officer:
EEGAEDING MATEEIAL SHIPPED JUNE 17TH PHILADELPHIA EEFEE TO EEGISTEEED LETTEE JUNE 12 EEQUESTING CANCELLATION CONTEACT.
The telegram was confirmed by letter of June 22,1953, from plaintiff’s secretary advising the contracting officer that plaintiff was ill and in a hospital and that it would be impossible to fulfill the contract. There is no other evidence that a registered letter was sent by plaintiff on June 12 or that it was received by the contracting officer.
By letter of July 15, 1953, plaintiff again requested the cancellation of contract TAP-1904, advising the contracting officer that it would be impossible to perform.
26. By supplementary agreement, as modification 1, dated August 5, 1953, contract TAP-1904 was terminated in its entirety without cost to the defendant.
*189 27. Tbe defendant incurred shipping costs under contract TAP-1904 in the sum of $1,143.19, which is claimed for recovery against the plaintiff. This portion of the defendant’s counterclaim is not now in dispute.[3]
28. As pointed out in finding 7, all of the bidders other than plaintiff who named a price (more than 50 of them) bid on a unit price of 60 cents or more. Plaintiff’s bid was 47 cents. Plaintiff notified defendant of various errors in his bid within a reasonable time after the bids were opened, and later made a determined effort, through telephone conversations, correspondence, and personal conferences with the contracting officer, to obtain an adjustment in the price or relief from performance of the contract.
The contract was awarded June 16, 1950, but the proof does not establish that plaintiff had received notice of the award when he sent the letter of June 17, 1950, with reference to errors in his bid.
The purchase of replacement duffel bags in June 1951 did not constitute a procurement of that item “within a reasonable time” after termination of plaintiff’s contract in January 1951, and the contracting officer so held. The Armed Services Board of Contract Appeals agreed that the repurchases made June 1, 1951, came too late, and did not furnish a proper basis for the assessment of excess costs.
CONCLUSIONS OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover of and from the United States the sum of twelve thousand eight hundred forty dollars ($12,840). It is further concluded that the United States is entitled to recover of and from the plaintiff a like sum.

 The Government has also asserted a second counterclaim for packing and transportation costs under still another manufacturing contract which it had with the plaintiff, Contract DA-30352-TAP-1904. However, the plaintiff has admitted his liability for those costs and has conceded that that amount will be an offset against any amount he may be awarded on his claim arising under Contract 3833.

 The various unit bid prices on replacement contracts, the dates of their submission, and the component bids included in the various average bid prices, are to be found in Finding No. 18.

 Plaintiff has stated that there is due from plaintiff to defendant, under contract TAP-1904, the sum of $1,143.19 which may be set off against the $12,840 due plaintiff under contract DA-30-280-QM-12130. Defendant now claims a loss of $31,691.37 under repurchase contracts, plus $1,143.19 shipping costs under contract TAP-1904, for a total of $32,834.56, leaving a net balance of $19,994.56 claimed by defendant (finding 23).