The TESTER CORPORATION

v.

The UNITED STATES.

No. 191–80C.

United States Claims Court.

Nov. 22, 1982.

Marvin P. Sadur, Washington, D.C., for plaintiff; Joel S. Rubinstein and Sadur & Pelland, Washington, D.C., of counsel.

Robert G. Giertz, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

LYDON, Judge:

This construction contract case is before the court on motions for partial summary judgment, and oppositions thereto, filed by the parties. In its motion, plaintiff contends that certain costs incurred by the government in contract reprocurement and completion brought on by a valid termination of plaintiff's contract for default are, as a matter of law, not properly recoverable. Plaintiff maintains that the costs in issue are not recoverable under the terms of the contract, particularly the Termination For Default clause, and under established procurement principles and precedents. Defendant's position is that these costs are proper recovery items under the above-mentioned clause and under established case law. For reasons set forth below, it is concluded that defendant's position correctly reflects the existing state of the law.

I.

On April 17, 1975, the Army and Air Force Exchange Service (AAFES) awarded a fixed price contract to plaintiff. This contract called for the construction of a service station at the Walter Reed Army Medical Center in Forest Glen, Maryland. The contract required the construction of a service station building, a protective pre-engineered canopy, four pump islands, and underground gasoline storage tanks and piping. The contract also required the pavement of certain surface areas and landscaping. The original contract price was $299,998. Five amendments were subsequently issued which increased the contract price to $404,432.91. The scheduled contract completion date was December 16, 1975.

During the course of contract performance, disputes arose concerning, inter alia, work involving the canopy, paving, the

backfill around the storage tanks, and the underground piping from the gasoline storage tanks to the distribution pumps. Relative thereto, the contracting officer directed plaintiff to perform certain corrective work. Plaintiff failed to do so. On May 12, 1976, the contracting officer terminated the contract for default on the grounds that plaintiff failed to perform the corrective work within the time specified by the contracting officer and that plaintiff failed to show why its failure to complete the work as required was beyond its control or without its fault or negligence. After soliciting bids for the completion of the work remaining to be done under the construction contract, the contracting officer awarded the defaulted contract to Coe Construction Company as low bidder.

Plaintiff appealed the contracting officer's termination for default to the Armed Services Board of Contract Appeals (Board) on June 14, 1976. The Board denied plaintiff's appeal on July 20, 1978, finding that the default termination was supported by the evidence. *Tester Corp.* ASBCA No. 21312, 78–2 BCA ¶ 13,373; plaintiff's motion for reconsideration was subsequently denied by the Board, 79–1 BCA ¶ 13,725. By letter dated October 22, 1979, the contracting officer rendered a final quantum decision holding that $164,358.84, plus interest, should be assessed against plaintiff as "excess costs of reprocurement" or "dam-

ages" resulting from the plaintiff's unexcused default. Plaintiff subsequently filed a petition in the United States Court of Claims requesting Wunderlich Act review of the adverse Board decision. The government, in its answer to this petition, asserted a counterclaim in the amount of $164,358.84 for damages it claimed were incurred as a result of plaintiff's unexcused default.

Subsequently, the court upheld the termination for default and remanded the matter to the Trial Division, now the United States Claims Court, for further proceedings concerning the issue of the government's reprocurement damages. *Tester Corp. v. United States,* Ct.Cl. No. 191–80C (order entered April 7, 1981), *rehearing denied* (order entered May 15, 1981).[1]

Upon remand, a pretrial order requiring quantum submissions by the parties was issued and thereafter the parties engaged in pretrial discovery. In its pretrial submission, the government reduced the amount of its reprocurement damages claim from $164,358.84 to $143,007.60. In its quantum schedules, the government set forth, *inter alia,* claims for recovery of: (a) design and inspection costs ($27,239.02); (b) travel costs of government personnel ($4,076.32); and (c) testing costs ($15,462.27).[2] These costs are the subject of the motions presently before the court for decision. Plaintiff has not, as yet, proffered its pretrial submission.

1. Plaintiff did not appeal the contracting officer's quantum decision to the Board. Since this quantum decision was rendered subsequent to March 1, 1979, the effective date of the Contract Disputes Act of 1978, Pub.L. No. 95–563, 92 Stat. 2383, 41 U.S.C. § 601 et seq. (Supp. II 1978), plaintiff could, and did, elect to proceed under that Act. Accordingly, plaintiff brought the quantum claim directly to the Court of Claims for *de nova* proceedings. In its order of April 7, 1981, the Court of Claims noted that plaintiff challenged many of defendant's excess reprocurement expenses and concluded these challenges raised a triable issue.

2. Relative to these costs, defendant alleges as follows: The design and inspection costs were charged to the government by an outside design architect, P.T. Astore, AIA (Astore), for preparing the reprocurement solicitations package and for additional on-site inspection services beyond the completion date contemplated

had plaintiff not defaulted on its contractual obligations. Astore had provided design and inspection services on the contract in issue before the default. The testing costs, performed after the default, were charged to the government by Law Engineering Testing Company. This company had a contract with the government to provide testing services during construction and, because of plaintiff's default, had to perform testing of work defectively done by plaintiff and corrective and completion work performed after default. After plaintiff's default, the government also incurred additional travel expenses for the contracting officer and his technical advisors relative to contract completion. Defendant avers that all of these claimed costs were reasonable, were directly related to the reprocurement completion work, and that none of these costs would have been incurred but for plaintiff's default.

## II.

Plaintiff contends that, under the terms of its contract with AAFES, the cost items set forth above, *i.e.,* design and inspection services, travel expenses and testing services, are not recoverable in default termination situations as a matter of law because these costs are not specifically set forth in the pertinent contract clause as recoverable items. A reading of the relevant provisions of the contract in question does not support plaintiff's position.

Paragraph 8 of the General Provisions of the contract between plaintiff and AAFES provided in pertinent part:

8. TERMINATION FOR DEFAULT DAMAGES FOR DELAY TIME EXTENSIONS. a. If the CONTRACTOR breaches any provision of this contract or refuses or fails to prosecute the work or any separable part thereof, with such diligence as will insure its completion within time specified in this contract, or any extensions thereof, or fails to complete said work within such time, the AAFES may, by written notice to the CONTRACTOR, terminate his right to proceed with the work, or such part of the work as to which there has been delay. In such event the AAFES may take over the work and prosecute the same to completion, by contract or otherwise, and may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. Whether or not the CONTRACTOR's right to proceed with the work is terminated, he and his sureties shall be liable for any damage to the AAFES resulting from his refusal or failure to complete the work within the specified time.

b. If fixed and agreed liquidated damages are provided in the contract and if the AAFES so terminates the CONTRACTOR's right to proceed, the resulting damage will consist of such liquidated damages until such reasonable time as may be required, for final completion of the work together with any increased costs occasioned by the AAFES in completing the work.

\*     \*     \*     \*     \*     \*

f. The rights and remedies of the AAFES provided in this clause are in addition to any other rights and remedies provided by law or under this contract.

Under recognized rules of contract interpretation, "words are to be given their plain and ordinary meanings." *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *Timber Access Industries Co. v. United States,* 213 Ct.Cl. 648, 553 F.2d 1250 (1977); *Whelan v. United States,* 208 Ct.Cl. 688, 529 F.2d 1000 (1976). In the present case, the plain and ordinary meaning of paragraphs 8(a) and (b), *supra,* is clearly that if the contractor defaults in the performance of a contract, as plaintiff did in this case, the contractor will be liable for *any damage to the AAFES* resulting from such default or for *any increased costs* incurred by the AAFES in completing the work. Therefore, pursuant to the plain meaning rule, it is concluded, despite plaintiff's assertions to the contrary, that under the express terms of the contract the cost items claimed by the government could be recovered under clauses 8(a) and (b) in a default termination situation.

Plaintiff notes that the General Provisions of the contract in issue were revised in October 1981 and that the Termination For Default clause was amended (bracketed language below) to read in pertinent part:

\* \* \* Whether or not the Contractor's right to proceed with the work is terminated, he and his sureties shall be liable for any damages to AAFES resulting from his refusal or failure to complete the work within the specific time. [Such damages will consist of, but not be limited to:

(1) Loss of net profit \* \* \*.

(2) Inspection costs for period of time delayed beyond completion time.

(3) Travel and per diem costs of AAFES employees for inspection visits beyond contract completion date.

(4) Cost incurred for rescheduling delivery of AAFES furnished equipment \* \* \*.]

Plaintiff argues that defendant, aware of the shortcomings of the General Provisions applicable to the contract in issue, and the restrictive and limited interpretation the administrative Boards had placed on the Termination For Default clause, amended the clause to overcome this restrictive situation. Plaintiff reads into this subsequent revision and amendment an admission and/or confirmation that the prior clause was deficient and that the Board's restrictive interpretations relative thereto were correct. Such is not the case. It is established that subsequent revision or clarification of contract language does not constitute an admission or confirmation that earlier language was defective or without any effect. Indeed, such a revision or amendment of procurement language in situations where past problems of disagreement existed is prudent and wise and is not deemed to constitute a legal liability concession of any kind. *Martin Lane Co. v. United States,* 193 Ct.Cl. 203, 217–18, 432 F.2d 1013, 1021 (1970).

Plaintiff's principal argument, in essence, rests not on contract language but on certain board decisions which, in excess cost situations[3] arising out of defaulted contracts, refused to allow for recovery of "administrative costs." Plaintiff cites *Arthur Q. Evans, Jr.,* ASBCA No. 10951, 66–1 BCA ¶ 5316 as the leading authority for its position. In the *Evans* case, the Board allowed the government in a default termination case to recover excess costs, *i.e.,* the difference between the defaulted contract price and the reprocurement contract price, but refused to allow the government to recover an additional $50, assessed by the contracting officer, for "administrative cost and the

processing of the reprocurement contractual documents" because "these costs are not normally assessed against a contractor." The Board noted that while the Armed Services Procurement Regulation specifically provides for the assessment of excess procurement cost it makes no provision for the assessment of administrative costs. 66 BCA ¶ 5316 at 24,986.[4]

Subsequent Board decisions, cited by plaintiff, followed the *Evans* holding and refused to allow extra administrative costs in reprocurement "excess cost" situations. See for example *Road-Roc, Inc.,* AGBCA No. 263, 73–1 BCA ¶ 9938; *Airco Engineers,* AGBCA No. 245, 72–1 BCA ¶ 9215. While not clear from a reading of the decisions cited and relied on by plaintiff, it would appear that these cases contained a default termination clause which made the defaulted contractor liable to the Government for any excess cost occasioned the Government thereby. *See* Speck, *Government Claims Against Contractors,* 13 Pub. Contract L.J. 137, 142 (1982). Such a clause would be quite different from the broader clause involved in this case, *i.e.,* the defaulted contractor is "liable for any damage to the AAFES * * *."

█ It has been noted that past Board decisions have engendered considerable confusion relative to the remedies, and the scope thereof, available to the government as a result of a default termination. *See* P. Latham, *Government Contracts-Disputes* 180–181 (1980). Under such circumstances the weight to be given such decisions is diminished by the confusion surrounding said decisions. Moreover, it is a well settled principle that while administrative Board

---

3. Excess cost situations embrace those cases in which the government sought to recover the difference between the amount paid to the reprocurement contractor and the defaulted contractor's contract price. *See Arthur Q. Evans, Jr.,* ASBCA No. 10951, 66–1 BCA ¶ 5316, at 24,986.

4. In order to come under the umbrella of these Board holdings, plaintiff characterizes the costs in question as "administrative costs." It offers no justification for such a characterization and none comes to mind. While defendant does

not take issue with this characterization, it is difficult to view the costs in question as administrative costs. The "administrative costs" in the *Evans* case are not similar in nature to the costs here in question. The costs in issue do not involve mere "paper-work" but rather are substantive costs necessary for contract completion and occasioned, so defendant alleges, by plaintiff's default. This fact alone serves to weaken plaintiff's position which rests heavily on viewing the cost items in question as "administrative costs."

decisions concerning legal interpretations may be given some weight, they are clearly not binding on this court or its predecessor court. *See Hegeman-Harris & Co. v. United States,* 194 Ct.Cl. 574, 580, 440 F.2d 1009, 1011 (1971); *W.H. Edwards Engineering Corp. v. United States,* 161 Ct.Cl. 322, 328 (1963).

Whatever vitality the holding of *Evans* and its progeny may have had, it is clear that it has been severely eroded as precedent in the procurement law field. Some Board decisions no longer give a restricted and limited interpretation of the default termination clause, even if such a clause defines reprocurement recovery in terms of "excess costs." *See Cable Systems & Assembly Co., Inc.,* ASBCA No. 17844, 73–2 BCA ¶ 10,172 at 47,890–92, a Board decision later in time than any cited by plaintiff. More importantly, the Court of Claims has refused to give a restrictive and limited interpretation of the language "excess costs" found in the default termination clause. *See Schmoll v. United States,* 105 Ct.Cl. 415, 452–53, 63 F.Supp. 753, 756 (1946); *Fireman's Fund Indemnity Co. v. United States,* 104 Ct.Cl. 649, 678–79, 63 F.Supp. 750, 752–53 (1945). Accordingly, the present legal climate provides no support for plaintiff's position that the costs in issue, even if they be characterized, *arguendo,* as "administrative costs," cannot be recovered as part of a reprocurement occasioned by a contractor's default of its contractual obligations unless specifically provided for in the contract.

Given the materials presently before the court, there is no valid basis on which to grant plaintiff's partial motion for summary judgment.

### III.

Defendant ignores plaintiff's "administrative costs" argument and does not rely on clauses 8(a) and (b) of the Default Termination provision. Instead, it focuses on clause 8(f) of said clause as the source of its right to seek recovery of the cost items in question. Defendant maintains that plaintiff's unexcused default constitutes a breach of contract which, under part 8(f) of the Default Termination clause, *supra,* gives the government its judicial remedy of suit for breach of contract.[5] Case law clearly supports defendant's position.

■ The April 7, 1982, decision of the Court of Claims upholding the default termination of plaintiff's contract established that plaintiff had breached its contract. Under such circumstances, the government under clause 8(f) has a right, as a matter of law, to seek recovery of common law damages in this court. *Marley v. United States,* 191 Ct.Cl. 205, 223, 423 F.2d 324, 334 (1970); *Rumley v. United States,* 152 Ct.Cl. 166, 170, 285 F.2d 773, 777 (1961). *See* Speck, *Government Claims Against Contractors,* 13 Pub. Contract L.J. 137, 152–54 (1982).

In *Rumley v. United States, supra,* 152 Ct.Cl. at 171–72, 285 F.2d at 777, where the government claimed reprocurement damages following a termination for default, the Court of Claims examined a contract clause virtually identical to clause 8(f) in the instant case and stated in pertinent part:

We think that this contract provision reserved to the defendant any common law remedies which it may have had, at the same time recognizing the right to assert claims for excess costs under clause 11(c). In point of fact, all that provision 11(c) does is to take a common law rule for determining damages for breach of contract, the difference between the contract price and the reasonable cost of obtaining performance after the breach, and says that if the Government repurchases within a reasonable time, the purchase price will be accepted as the reasonable costs of obtaining performance with no further proof required.

---

5. The only question raised by the motions before the court is whether the government, as a matter of law, has a right to seek recovery, as a result of plaintiff's breach of contract, of the cost items in question. This opinion is not concerned with the questions of whether the costs in issue were foreseeable, direct, natural and proximate results of the breach. These are matters for trial, if the parties are otherwise unable to reach agreement on quantum.

Though the defendant may not now satisfy its burden of proving damages merely by showing what was the unit price on the re-letting of Contract 3833, we think that it should be given an opportunity to show, as a matter of common law contract damages, how much the cost of obtaining performance was increased as a result of plaintiff's breach. * * *

Likewise, in *Marley v. United States, supra,* a reprocurement action following a termination for default, the Court of Claims held that a clause identical to clause 8(f) here in issue preserved to the government its common law judicial remedy for breach of contract despite a loss of the express contractual right to excess costs. The court in *Marley* further noted that although in *Rumley v. United States, supra,* the government's claim for excess costs had been denied administratively on the ground that reprocurement had not been made within a reasonable time period, the right to sue for common law damages for breach of contract was nevertheless available pursuant to a clause identical to clause 8(f) in the present case. More importantly, neither the *Rumley* nor the *Marley* cases suggested or even hinted that the government, as implied by plaintiff, must first exercise its contractual right to excess costs before resorting to its right to common law damages. No case has been cited for such a proposition and none has been uncovered by research. Rather, as the first sentence in the previously-cited language in *Rumley v. United States, supra,* indicates, the government can utilize in default termination situations either, or both, of the two remedy avenues available to it under the provisions of the contract. If, in a given situation, the government utilized the "excess cost" approach and recovered only the difference between the defaulted contract price and the reprocured contract price, it would not be precluded from seeking in a judicial action additional costs it incurred as a result of plaintiff's breach. *Astro-Space Labs, Inc. v. United States,* 200 Ct.Cl. 282, 311–12, 470 F.2d 1003, 1009–20 (1972).

Here, because clause 8(f) similarly provided for such a judicial remedy, the government has the right to seek common law damages for breach of contract following a termination for default. Therefore, despite plaintiff's contention to the contrary, the damages recoverable by the government as a result of plaintiff's breach are not limited solely to the excess dollar amount paid to the reprocurement contractor, the so-called "excess costs." Instead, pursuant to established case law discussed above, the government is entitled to pursue its judicial remedy seeking common law damages. Accordingly, the government may seek to recover herein all damages, which include the cost items here in question, that are the foreseeable, direct, natural and proximate results of the breach. *William Cramp & Sons v. United States,* 50 Ct.Cl. 179, 191 (1915); *Hadley v. Baxendale,* 9 Exch. 341, 156 Eng. Rep. 145 (1854). *See* Speck, *Government Claims Against Contractors, supra,* 13 Pub. Contracts L.J. at 154; *see also* P. Latham, *Government Contracts—Disputes, supra,* at 180–81.

Plaintiff ostensibly does not dispute the force and impact of the *Rumley* and *Marley* holdings on the position it advances. Instead, it argues that defendant failed to specifically plead, *in haec verba,* for a common law damage recovery. Plaintiff notes that in the contracting officer's decision, plaintiff was held to be indebted to AAFES "in the amount of $167,695.29 (which included interest) as *excessive costs of reprocurement,*" that defendant in a paragraph of its amended answer used the words "excess costs experienced in the reprocurement," and that the Court of Claims in its April 7, 1982, order stated that " * * * plaintiff may appeal here *de novo,* but only on the issue of quantum of the *excess reprocurement* costs." Plaintiff reads into the underscored language, *supra,* a finding that the matter before the court now is an "excess costs" case and not a breach of contract case where the remedy is common law damages. Such reasoning and argument is specious. In remanding the matter to the trial division in its April 7, 1982, order, the Court of Claims sent it back "for further proceedings concerning the government's reprocurement *damages.*"

█ It is well settled that technical rules of pleading are a relic of the past. All that a pleading is required to do is to give fair notice of the claim asserted to the other side 2A *Moore's Federal Practice* ¶ 8.13 (2d ed. 1976). In this case, it is concluded that the government's counterclaim, as pleaded, is legally sufficient and fairly appraises plaintiff of the nature and amount of the claim asserted against plaintiff. In its counterclaim defendant claimed that as a result of plaintiff's default it:

> * * * incurred additional costs in the performance of that contract in excess of the costs which would have been incurred had plaintiff completed the contract in accordance with the terms and conditions therein. The excess of the cost experienced in the reprocurement is in the amount of $164,358.84.[6]

In clear, simple and concise form, defendant has claimed all "additional costs" incurred as a result of plaintiff's breach. Moreover, the counterclaim specifically listed the amount of additional costs sought as $164,-358.84, the precise amount (minus interest) assessed by the contracting officer in his final decision which specifically included the costs in question. Thus, the counterclaim did not limit the recovery sought to merely the amount paid to the reprocurement contractor as plaintiff implies. Rather, it clearly and concisely sought recovery for all additional costs which included the so-called "administrative costs" in question engendered by plaintiff's default. Defendant's counterclaim provided plaintiff with sufficient notice of its damages claim. Despite plaintiff's contentions, the magic words "common law damages" need not appear in a pleading which seeks recovery for breach of contract. *See Schmoll v. United States, supra,* 105 Ct.Cl. at 453, 63 F.Supp. at 756.

█ It is clear that, properly established, "administrative costs," or cost items similar to those here in issue, are recoverable in breach of contract cases. *See Southeastern Airways Corp. v. United States,* 230 Ct.Cl. —, —, 673 F.2d 368, 379–80 (1982), a termination for default-reprocurement damage case which allowed for recovery of "administrative costs." In *Page v. United States,* 120 Ct.Cl. 27, 57 (1951), the Court of Claims allowed for the recovery of "inspection costs," a cost item in dispute in this case. Recovery was allowed in the *Page* case for inspection costs because they "were actual damages sustained by defendant on account of plaintiff's failure to complete the work within the contract time." Plaintiff seeks to distinguish the *Page* holding in this regard by noting that the *Page* case was a delay damages case rather than a default-termination reprocurement case. The simple answer to plaintiff's contention is that both the *Page* case and the instant case are breach of contract cases and thus call for the recovery of common law damages flowing from said breach. It matters not whether the breach was the result of delay or default relative to the assessment of damages. *See Fireman's Fund Indemnity Co. v. United States, supra,* 104 Ct.Cl. at 678–79, 63 F.Supp. at 752–53.

█ As a final salvo, plaintiff contends that there was no final administrative decision from the contracting officer regarding "damages" and, therefore, the court lacks jurisdiction over said claim. The short answer to this contention is that the contracting officer has rendered a final decision on the defendant's claim for damages. Plaintiff relied on this decision in gaining access to this court in order to challenge the assessment of damages rendered against it (*see* note 1, *supra*). As stated above, the contracting officer's decision did not limit the claim to only the amount paid to the reprocurement contractor, but rather included "additional design and inspection

---

**6.** The language of this pleading embodies the basic concept of a breach of contract recovery in that it asserts that the government is entitled to be put in as good a position as it would have been in had the contract been performed according to its terms. *See* 11 *Williston on Contracts* § 1338 (3d ed. 1968); 5 *A. Corbin On Contracts* § 992 (1964). Defendant in its pleading, in essence, requests an "opportunity to show, as a matter of common law damages how much the cost of obtaining performance was increased as a result of plaintiff's breach." *Rumley v. United States,* 152 Ct.Cl. 166, 172, 285 F.2d 773, 777 (1961).

costs, travel and per diem for AAFES employees and testing fees," precisely the same costs sought in defendant's counterclaim for damages. Furthermore, the contracting officer's decision itself expressly refers to the additional costs incurred by the government as "damages," *inter alia.* One has only to read the contracting officer's determination of October 22, 1979, on quantum in order to conclude that the contracting officer did, in fact, render a final decision on the question of damages.

### IV.

In light of the foregoing discussion, plaintiff's motion for partial summary judgment is denied and defendant's cross-motion for partial summary judgment is granted. *See* note 5, *supra.* Plaintiff's pretrial response, in accordance with the Pretrial Order On Quantum issued on January 27, 1982, shall be served on defendant, with a copy to the judge, on or before January 10, 1983.