Francis M. MARLEY (Formerly Joseph H. Coleman, Receiver in Bankruptcy of Firth Machine & Tool, Inc., Bankrupt, and the First National Bank of Fostoria, Ohio, Assignee)

v.

The UNITED STATES.

No. 3–60.

United States Court of Claims.
March 20, 1970.

See also 180 Ct.Cl. 898, 381 F.2d 738.

I. H. Wachtel, Washington, D. C., attorney of record, for plaintiffs, Sheldon I. Matzkin, Washington, D. C., of counsel.

Robert R. Donlan, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and report filed on August 15, 1969, wherein such facts as are necessary to the opinion are set forth. Requests for review by the court were filed by both parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same as

the basis for its judgment in this case. Therefore, in accordance with the said opinion: plaintiff's motion for summary judgment on the first cause of action, seeking review of the decision of the Armed Service Board of Contract Appeals, is denied, the government's motion for summary judgment granted, and the first cause of action dismissed; partial summary judgment is entered on plaintiff's second cause of action, adjudicating that defendant is liable to plaintiff in the sum of $45,434.33, subject to set-off in the amount awarded to defendant, after trial, on its first and second counterclaims and in all other respects, the cross-motion for summary judgment concerning the second cause of action is denied; and, partial summary judgment is entered, on the government's motion for summary judgment on its first counterclaim and on its plea of set-off to plaintiff's second cause of action, adjudicating that the contract was breached by plaintiff's predecessor, Firth Machine & Tool, Inc., and that plaintiff is liable for damages, to the extent only of any amounts found to be due to him on the trial of his second cause of action, the damages to be determined in further proceedings, to begin after a period of 90 days, and the motion is denied in all other respects.

## OPINION OF COMMISSIONER

SCHWARTZ, Commissioner:

Cross-motions for summary judgment raise issues concerning an ordnance contract, held by the Firth Machine & Tool, Inc., which was the subject of proceedings before the Armed Services Board of Contract Appeals. Firth became bankrupt pending the proceedings; its receiver and trustee prosecuted an administrative appeal and brought suit in this court in 1960. The present plaintiff, the purchaser at a bankruptcy sale of Firth's claims against the government, has been substituted for the receiver and trustee as the sole party plaintiff. The term plaintiff will be used herein to refer to the contractor, Firth, to its trustee in bankruptcy and to the successor to the trustee, the present plaintiff.

The contract held by plaintiff was terminated by the government in 1957, for default in making deliveries, and the government demanded of plaintiff the costs of the procurement elsewhere of the goods in excess of the contract price. In his first count, plaintiff seeks a review, in accordance with the Wunderlich Act, 41 U.S.C. §§ 321, 322, of the decision of the Board of Contract Appeals upholding the termination of the contract for default. A second count claims a sum of money in large part admittedly owed by the government to plaintiff, on unrelated contracts. The claim for money owed is subject to the government's larger claim, pleaded both as a set-off and as a counterclaim, for the excess procurement costs mentioned or in the alternative for damages for breach of the contract. The essence of the controversy is thus plaintiff's claim that the Board acted unlawfully in rejecting his excuses for his failures to deliver and in refusing to treat the default as one for the government's convenience, and the government's converse claim that the Board's decision upholding the termination for default is a final and binding adjudication of plaintiff's breach of contract, for which he is in consequence liable for excess costs or damages.

The case has been twice the subject of decision by the court, once on the rights of an assignee bank, no longer a party to the case (Coleman v. United States, 158 Ct.Cl. 490 (1962)), and once on the effect of the bankruptcy proceedings on rights of the present movant (Marley v. United States, 381 F.2d 738, 180 Ct.Cl. 898 (1967)). The second decision held the government's counterclaim and set-off, which were pending at the time of the bankruptcy sale of plaintiff's claim in 1965, to be unaffected by that sale, though it was made free and clear of liens.

I.

*The First Cause of Action—Plaintiff's Challenge of the Board Decision Upholding the Termination for Default*

The contract, let by the Frankford Arsenal in April 1956, provided for the man-

ufacture and supply of some 17,874 units, at $6.75 each, of a cartridge-activated device known as an M3 initiator, used in ejecting the pilot's seat from an aircraft.

Plaintiff and its subcontractors were increasingly delinquent in deliveries throughout the short life of the contract, from July of 1956 when deliveries were first due, to February of 1957, when the contract was terminated for default. The contract called for delivery of the first production "lot" in July, two lots in August and three in September and in succeeding months. A lot consisted of 610 units; a few extras were customarily added. The first production lot, due in July, was delivered in two parts, 240 units in July and 378 in August. The deliveries scheduled for August and September were not made. One lot was delivered in October and one in November. As of the end of November, only three lots had been delivered of 12 scheduled for delivery.

The source of the trouble was both volume of production and the quality of such units as were produced. The M3 initiator had been redesigned shortly before the contract was awarded, and plaintiff and his subcontractors had no experience with its production. The parts made by subcontractors suffered a high rate of rejection by plaintiff itself. Large numbers of parts and assembled units which were passed by plaintiff and tendered by him for delivery, failed to pass inspection by the government inspector stationed at the plant. And substantially all the units passed by the resident inspector failed to pass inspection at the Arsenal, the point from which initiators were shipped for use in aircraft.

Efforts were made to cure the troubles, in joint visits by the plaintiff's and the government's representatives to the subcontractors' plants. As early as July, plaintiff cancelled one of its subcontracts, and itself undertook the fabrication of the part involved. In a letter to the government requesting a modification of the delivery schedule, plaintiff

acknowledged that it was responsible for having misjudged the capacity of the subcontractor. Promises of improvement made by the other subcontractor were not fulfilled and the parts produced continued to suffer a high rate of rejection. Further meetings and consultations were held and proposals made. The remaining subcontractor was cancelled in part and a third subcontractor enlisted.

On the basis of these cancellations and of hopes for the future, plaintiff proposed and on November 8, 1956, the government agreed to a modified contract which overlooked past delinquencies and established a new schedule of deliveries. The new schedule called for delivery in November of the one lot actually delivered in that month, plus 240 "reworked" units (first delivered in July and found to be defective on inspection at the Arsenal), two lots in December, plus 378 "reworked" units (delivered in August and found at the Arsenal to be defective), two lots in January, three lots in February and four in each of the succeeding months. (A lot was now calculated at 612 units.)

The lot delivered in November passed inspection at the plant and was accepted; it failed inspection at the Arsenal, as did the 240 reworked units. Thereafter, plaintiff made no deliveries. No units were tendered in December. In January, 288 units were tendered and failed to pass inpection at the plant, and in February, 244 units were tendered and failed inspection. On January 16, 1957, the government warned plaintiff, in a "show cause" letter, that the contract would be terminated unless he delivered, by February 16, two lots and 618 reworked units. On February 18, no deliveries having been made, the contract was terminated for default.

The contracting officer and, on an appeal by plaintiff, the Armed Services Board of Contract Appeals held the termination for default to have been proper. Both rejected plaintiff's excuse that his defaults were beyond his control within

the meaning of clause 11(b) of the contract, the standard default clause.[1]

This suit followed, for a review of the Board's decision, claimed to be unsupported by substantial evidence and erroneous in law. Plaintiff contends that the termination for default should be held improper, and, pursuant to clause 11(e) (n. 1, *supra*) and the convenience-termination clause of the contract, converted into a termination for the convenience of the government, for which appropriate costs are payable. See General Builders Supply Co. v. United States, 409 F.2d 246, 187 Ct.Cl. 477 (1969).

■■■ Plaintiff moves for summary judgment on the ground that in rejecting his excuses the Board acted without supporting evidence. The motion is made reluctantly and under protest, pursuant to direction by the trial commissioner. Plaintiff claims that his cause of action is in reality one for breach of contract, entitled to a trial by the court de novo. Excessive and erroneous inspection by the government, plaintiff argues amounted to a breach of the government's implied obligation not to hinder him in making performance. Plaintiff's claims, before the contract was terminated, were, however, essentially claims for changes, extra costs and extensions of time, by reason of improper rejections and double inspection under a contract providing for single inspection only. Such claims are administratively redressable by the Armed Services Board of Contract Appeals by an award of an equitable adjustment. See United States v. Utah Constr. & Mining Co., 384 U.S. 394, 413–419, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Spector, An Analysis of the Standard "Changes" Clause, 25 Fed.B.J. 177 (1965); Shedd, Disputes and Appeals: The Armed Services Board of Contract Appeals, 29 Law & Contemp. Probs. 39, 74 (1964); *e. g.*, Sternberger v. United States, 401 F.2d 1012, 185 Ct. Cl. 528 (1968). Accordingly, the claims may not by redescription be converted into breach of contract claims to be tried by the court. United States v. Utah

---

1. The provisions of clause 11 of the contract relevant to the contentions made in the case are these:

 11. *Default*

 \* \* \* \* \*

 (b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

 (c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, *Provided,* That the Contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

 \* \* \* \* \*

 (e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled "Termination for Convenience of the Government," and the rights and obligations of the parties hereto shall in such event be governed by such clause. *(Except as otherwise provided in this contract, this paragraph (e) applies only if this contract is with a military department.)*

 (f) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

 \* \* \* \* \*

Constr. & Mining Co., *supra*, 384 U.S. at 419–420, 86 S.Ct. 1545; Morrison-Knudsen Co. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965); L. W. Foster Sportswear Co., Inc. v. United States, 405 F.2d 1285, 1287, 186 Ct.Cl. 499, 502 (1969). Once plaintiff's contract was terminated for default, he recognized that he had an administrative remedy under the contract, by claiming that the termination should be treated as a convenience-termination under subdivision (e) of the default clause, and costs awarded. In such a case he may not sue for breach of contract. General Builders Supply Co. v. United States, *supra*.

The merits of the challenge to the Board's decision are now to be considered.

The Board held that the principal cause of the plaintiff's failure to deliver sufficient number of parts and units capable of passing inspection was the lack of know-how and competence of plaintiff and his subcontractors. The Board rejected, as unsupported by the evidence, the excuse offered by plaintiff—alleged "inspection differences" between the Frankford Arsenal and the ordnance inspector resident at the plant. Not convinced that there were such differences, the Board held that even if they existed there was no evidence that they affected plaintiff's ability to make deliveries under the modified contract.

 Whether a default is excusable is most often, as here, a question of fact. *E. g.*, Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 474, *cert. denied*, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963) and cases cited. The Board's decision was therefore a decision of an issue of fact, which is final and binding on this court under the Wunderlich Act, 41 U.S.C. § 321, if it is supported by substantial evidence, and not arbitrary, capricious or fraudulent.

██ Where, as here, the claim is that the evidence did not support the findings, and supported a contrary finding, the court does not reweigh the evidence to determine whether it is in agreement with the findings of the Board. The inquiry is directed to whether on the disputed facts the Board had substantial evidence to support its determinations. Plaintiff has the burden of showing that no such evidence is in the record, or that the evidence contrary to the Board's findings is either overwhelming in itself or so detracts from the evidence in support of the Board's findings as to render it less than substantial on the record as a whole. Koppers Co., Inc. v. United States, 405 F.2d 554, 558–559, 186 Ct.Cl. 142, 149–151 (1968); Dean Constr. Co. v. United States, 411 F.2d 1238, 1241, 188 Ct.Cl. 62, 67–68 (1969). Plaintiff has failed to meet this burden.

██ On the one hand, the record contains evidence of substance amply supporting the finding that plaintiff's defaults had their roots in incompetence and were thus not excusable. This evidence includes plaintiff's low bid ($6.75, the third lowest of 38 bids, 25 of which ranged from $10 to $81.30); the lack of experience of plaintiff and his subcontractors; the high rate of rejection of parts produced by subcontractors (at one point the rejection rate was 50 percent; in one case all but 297 of a group of 339 were defective); plaintiff's cancellation of two subcontractors and his admission of the incompetence of one of them; and, finally, plaintiff's failure during the life of the contract to protest the inspections or the rejections at the plant or at the Arsenal.

On the other hand, little or no evidence of substance supports plaintiff's excuse for his failures to deliver—that "inspection differences" between the inspector resident at the plant and the inspectors at Frankford Arsenal led to rejections by the Arsenal of units inspected and passed at the plant, with such consequent confusion and chaos at plaintiff's plant as prevented plaintiff from producing and delivering in accordance with the contract.

A claim of "faulty, obsolete" gauges at the Arsenal is the crux of the "inspection differences." Plaintiff's characteriza-

tion of the gauges as "faulty" is gratuitous. No evidence appears of defects or faults in these gauges; they were at most technically obsolete.

The chief of the inspection division of the Cleveland Ordnance District, who attended an inspection at the Arsenal, wrote a report in which he criticized the Arsenal's gauges as obsolete, some of them by 3 or 4 years. The gauges used by the inspector at the plant, on the other hand, were an up-to-date set. This report is substantially the only evidence relied upon by plaintiff.

The author of the report in his testimony indicated that he did not mean that the Arsenal's gauges were incorrect but only that they were not efficient. (The lot undergoing the inspection described in the report passed inspection on the Arsenal's gauges and later failed in a ballistics test.) Other witnesses testified that the gauges, though obsolete, were capable of measuring correctly. The Board was thus warranted in refusing to find that the obsolescence of the Arsenal's gauges affected their performance.

Evidence of substance suggests that the sampling technique used in testing was the cause of the differences in results of dimensional testing conducted at the Arsenal and at the plant. Samples of a lot or a group were selected for testing, and if they failed to pass, the entire lot would be rejected. In consequence, the witnesses could not say that the Arsenal had rejected the very same unit that had passed inspection at the plant. The rate of defective parts being delivered to plaintiff was so great, one witness testified, that the lots produced could not be purged by one sampling for testing. No claim is made, however, of overstrict standards or of inadequate sampling. Inspection of such a device is, finally, a delicate and complex affair, requiring the use of 140 gauges to make the specified dimensional checks. The testimony is that questions of judgment are involved; there is more than one way to read a gauge. In sum, no evidence appears that any of the rejections at the Arsenal were erroneous or that its tests were incorrectly performed.

The "differences" in the results of testing at the Arsenal and at the plant were, in any event, not so great. The first of the two lots delivered under the contract prior to its modification was rejected at the Arsenal on the same dimensional testing by gauges as was performed at the plant. The second lot passed dimensional testing at both plant and Arsenal, and failed in a ballistics test at the Arsenal. The only lot delivered under the contract as modified, in November, was rejected at the Arsenal on the same inspection as had approved the lot at the plant. (The record is not clear on whether the reworked group of 240, also delivered in November and rejected at the Arsenal, had earlier been inspected and approved at the plant.) The remaining 532 units tendered under the modified contract were rejected at the plant, after an inspection conducted jointly by the plant inspector, representatives of the Cleveland Ordnance District and of the Arsenal.

It thus appears that only one lot under the original contract and one under the modified contract were rejected at the Arsenal on the basis of the same dimensional tests as were performed at the plant.

Actual returns to plaintiff's plant were smaller still. Units passing inspection at the plant were accepted subject to functioning tests to be performed at the Arsenal. The Arsenal, responsible for supplying the devices for use in aircraft, reinspected for dimensional compliance with specifications and also performed functional tests. When it rejected a lot for issuance to the field, it solicited plaintiff's agreement to accept a return of the units and to rework them. Units were returned only with plaintiff's agreement. Only the first 240 units, delivered in July, were actually returned to plaintiff for rework.

Lastly, no showing was made of any material connection between the rejections at the Arsenal—or all rejections—

and the gross failure of the plaintiff to make the deliveries required under the contract. In the period of the original contract, July through October, nine lots of 5,490 units were scheduled for delivery; plaintiff delivered two lots of 1,230 units, a default of more than 75 percent. During the period of the modified contract, November through January, five production lots of 3,060 units and one reworked lot of 618 units were required to be delivered; plaintiff delivered one production lot of 612 units and 240 reworked units and tendered one incomplete lot of 532. Under the contract terminated for default, therefore, and even assuming that all tenders passed inspection, plaintiff produced only 1,384 of 3,678 required units, a default of 2,294 units or more than 60 percent of required deliveries.

The number of units failed to be delivered dwarfed the number rejected in the tests complained of—dimensional tests at the Arsenal—which, in turn, dwarfed the number actually returned to plaintiff for reworking. This alone would go far to show that simple inability to produce, and not rejections, improper inspections or "inspection differences," was the cause of the default. Rejections at the Arsenal were no doubt disheartening and added to the confusion existing at plaintiff's and his subcontractors' plants. The confusion was, however, not attributable to government wrongs. The Board's decision falls well within the "zone of reasonableness" provided by the record. Williamsburg Drapery Co., Inc. v. United States, 407 F.2d 1342, 1344, 187 Ct.Cl. 298, 303 (1969).

Plaintiff makes one contention of law, on which, of course, this court is not bound by the decision of the Board. 41 U.S.C. § 322. Inspection at the Arsenal and the consequent return of units to plaintiff following such inspection are claimed to have been a breach of the contract provision for inspection, acceptance and delivery at the plant.

The contention is without merit. Functional testing, for example the ballistics tests mentioned, could not be performed at the plant. Plaintiff conceded before the Board that the contract permitted such tests at the Arsenal. As for dimensional testing, when the Arsenal reinspected for dimensional accuracy, it was not making a test for purposes of acceptance of the goods under the contract, but in pursuance of its responsibilities as the supplier of the devices to military channels, for actual use in aircraft. The "rejection" of the unit was a rejection for purposes of issuance of the unit to the field. On such rejection, the Arsenal returned units to plaintiff only with plaintiff's consent.

The Board committed no error in upholding the termination for default. Accordingly, the government's motion for summary judgment dismissing plaintiff's first cause of action should be granted, plaintiff's cross-motion denied, and the petition dismissed insofar as the first cause of action is concerned.

## II.

### The Government's Counterclaim and Set-Off for Excess Costs of Procurement or Damages for Breach of Contract

The government has counterclaimed for $93,029.06, as the excess costs of its reprocurement of the units which plaintiff failed to deliver, or as its damages from plaintiff's breach of contract. The same claim is pleaded as a set-off to a second cause of action by plaintiff, for money owed.

The government moves for summary judgment on its counterclaim, contending that its right to excess costs has been administratively determined, in a manner final and binding on this court, under the disputes clause in the contract and the Wunderlich Act.

### The Claim for Excess Costs

When plaintiff's contract was terminated for default on February 18, 1957, he had failed to deliver 17,007 initiators, whose contract price was $6.75 each. The government's officers in charge thereupon determined to reprocure the defaulted items, obtained au-

thority to negotiate an individual contract and requested bids from three suppliers. Two bids were received, one for $16.1131 and one for $19.38 per unit, and on June 7, 1957, the government awarded a contract to the lower bidder. The difference between the unit price in this contract, $16.1131, and the original contract price of $6.75 is $9.3631, which, when multiplied by the 17,007 units involved, comes to $159,238.24. Excess costs in this amount were assessed against the plaintiff, under clause 11(e) of the contract (note 1, *supra*), and the contracting officer demanded payment, in letters dated July 30 and November 29, 1957.

Plaintiff appealed the assessment to the Board, whose decision of July 30, 1959, upholding the termination for default is the subject of Part I of this opinion. Thereafter, on December 2, 1959, and January 29, 1960, the contracting officer wrote to plaintiff, demanding payment of $93,029.06, the amount claimed by the government in its counterclaim and on the instant motion for summary judgment. The nature of the Board's decision on excess costs and of the contracting officer's subsequent action are in issue.

The government reads the Board's decision as holding that the government was entitled to excess procurement costs, and that the contracting officer had erred merely in using an improper unit cost as the basis for his assessment. Impliedly, therefore, the government continues, the Board authorized reassessment by a correct method, which the contracting officer proceeded to do, using $9.8726 as the lowest appropriate figure, and arriving at the total of $93,029.06, which he demanded that plaintiff pay. Plaintiff failed to appeal from his decision, and, therefore, the government concludes, the assessment of $93,029.06 is final and binding on this motion.

It may be queried whether an assessment of excess costs not appealed to the Board would have the claimed effect. Dean Constr. Co., Inc. v. United States, *supra*, 411 F.2d at 1245, 188 Ct.Cl. at 74.

In any event plaintiff differs sharply with the government on what the Board decided and what the contracting officer did thereafter.

According to the plaintiff, the Board denied the claim for excess costs, without more, and consequently the contracting officer was not authorized to reassess excess costs. Plaintiff interprets his action as merely a demand for $93,029.06 as damages for a claimed breach of contract, from which an administrative appeal is impossible. The demand having no binding or other effect, it would follow that the motion for summary judgment must be denied insofar as it is grounded upon the failure to appeal.

Plaintiff is correct. The Board's opinion is clear that its denial of the claim for excess costs was for a non-remediable defect. It held that liability did not attach for failure to solicit sufficient bids at the time of reprocurement. The governing rule of law was stated as follows: "It is well established that liability for excess costs will not attach when the Government repurchase action is so tentative as to constitute failure to mitigate damages." This rule was found to be applicable, on a review of the facts of the repurchase. The Board concluded that the government was without justification in soliciting bids from only three manufacturers, one of whom declined to bid, for reprocurement of a contract on which 38 bids had been received. The government had "ample time," the Board said, for the solicitation of more bids, during the four months between the termination of plaintiff's contract in February and the award in June of the contract for reprocurement.

The Board also pointed out the impropriety of awarding a reprocurement at $16.1131 "within weeks of awarding two other contracts at unit prices substantially lower." Those two other contracts were awarded in May, at unit costs, respectively, of $9.8726 and $12.10. The Board doubted that had more bids been solicited the government would have received an offer as low as the $6.75 unit price of the defaulted contract; "[i]t is

nevertheless possible that had more prospective offerors been solicited a better price than that for which the reprocurement was effected may have been received. The excess costs charged to appellant, in our opinion, include a significant amount which might have been avoided." The opinion ends as follows: "We conclude that the government has failed to minimize excess costs and hence its assessment of excess costs cannot be sustained."

No words of remand appear. No hint appears that the fault lay in the contracting officer's method of assessment or in his choice of basic figures. No suggestion was made that the assessment might be corrected, by the use of the unit prices in the May contracts or otherwise. Such notions would be wholly incompatible with the holding that the repurchase having been defective or "tentative" for lack of sufficient solicitation of bids, "liability for excess costs will not attach."

The Board plainly held that the right to excess costs had been lost. Such phrases as "failure to minimize excess costs" or "failure to mitigate damages" do not make applicable, to questions of excess costs, the law of breach of contract damages, in which failure to mitigate damages need not prevent an award but only affect its amount. A proceeding to pass on excess costs is far different from the trial of an issue of breach-of-contract damages. An award of excess costs is by the terms of the contract clause based on a single reprocurement. A proper reprocurement relieves the Government of the burden of proving market value in a suit for damages for breach of contract. The contractor's pocket must, however, be protected from the consequences of an extravagant or improper reprocurement. The award is therefore conditioned upon proof of a reprocurement action reasonably designed to minimize the excess costs. When the reprocurement relied upon by the Government is found, for a sufficient reason, not to have been so designed, it may not be a basis for an award, and the right to excess costs is lost. Rumley v. United

States, 285 F.2d 773, 152 Ct.Cl. 166 (1961) (reprocurement too late); Alabama Shirt & Trouser Co. v. United States, 121 Ct.Cl. 313 (1952) (insufficient solicitation of bids). See Paul, United States Government Contracts & Subcontracts, 481–485 (1964). This is what occurred in this case.

The contracting officer was thus not authorized, by the contract or by the Board decision, to "reassess" or "recompute" excess costs, and he did not purport to do so. In the 1959 letters demanding $93,029.06, on which the government now relies, he wrote that "[w]hether or not the government reprocured," the contractor became liable for damages for the difference between the contract price and the market value at the time of breach. He was plainly abandoning the claim for excess costs denied by the Board, and substituting a claim for breach. As authority, he cited subdivision (f) of clause 11 of the contract (note 1, *supra*), preserving to the government any rights and remedies other than those provided under the clause itself. The letter concluded: "Accordingly, the claim of the Government for damages occasioned for your breach of Contract 1958 is administratively determined to be $93,284.06 [later corrected to $93,029.06], and demand is hereby made for that amount."

The vast difference between this 1959 letter and an assessment of excess costs may be seen by a comparison with the same officers' 1957 assessment of excess costs at $159,238.24. The 1957 letter assessing costs was entitled "Findings and Determinations of Contracting Officer in Connection with Contract * * * ORD–1588." The 1959 letter was entitled "Letter of Claim Assessing Damages in Connection with Termination of Contract * * * ORD–1958." The 1957 letter concluded with a paragraph advising the recipient of his rights to an appeal to the Board—the hallmark of a decision of a dispute under the contract. Bostwick-Batterson Co. v. United States, 283 F.2d 956, 151 Ct.Cl. 560 (1960); Keystone Coat & Apron Mfg. Corp. v. United States, 150 Ct.Cl. 277 (1960), *cert.*

**334**

*denied,* 372 U.S. 942, 83 S.Ct. 935, 9 L. Ed.2d 968 (1963). The 1959 letter contained no such paragraph, and concluded with a demand for $93,284.06 upon a "claim for damages occasioned by your breach of Contract 1588."

The 1959 letter was not an administrative determination; no appeal was possible, and it is not binding here. It was, as plaintiff says, no more than a demand by one party to a contract upon the other for damages for a claimed breach. Accordingly, the government's motion for summary judgment must be denied insofar as it rests on the first ground claimed to support it—findings in the Board's decision and the subsequent demand of the contracting officer for damages of $93,029.06.

### The Claim for Damages for Breach of Contract

The government next advances, as grounds for summary judgment, this position: Despite the administrative denial of the claim for excess costs, the right to a judicial remedy for breach of contract damages is preserved under clause 11(f) (note 1, *supra*). In the suit for such damages, now brought, the administrative decision upholding the termination for default is final and binding, and it is conclusive, against the plaintiff, on the issue of his breach of contract. On the remaining issue of the amount of damages, there are findings in the Board's opinion entitled to binding effect, which determine or at least support the fixing of damages in the same amount as demanded by the contracting officer, $93,029.06; and if there are no such findings, there is evidence in the administrative record which supports summary judgment for that amount or, at least, in the amount of $53,106.06.

*The Defense of Election of Remedies.* Plaintiff's first response to the foregoing is a plea of election of remedies and res judicata. By clause 11(f) of the contract (note 1, *supra*), plaintiff argues, the government was required to elect one of two remedies, either an administrative

claim for excess costs or a judicial suit for damages for breach of contract, and having elected the former, and having failed before the Board, the claim has been adjudicated and the latter remedy may not be pursued.

Clause 11(f) is not open to this construction. It is settled that the clause preserves to the government its judicial remedy of suit for breach of contract damages despite a loss of the right to excess costs. Rumley v. United States, *supra;* Alabama Shirt & Trouser Co. v. United States, *supra.* In *Rumley,* the governments' claim under clause 11(c) for excess costs had been denied administratively on the ground that the reprocurement was not made within a reasonable time. The court held that the right to sue for common law damages for breach of contract was nevertheless saved by subdivision (f) of clause 11. Judge Durfee, in his opinion for the court, explained the relationship of the administrative and judicial remedies as follows (285 F.2d at 777, 152 Ct.Cl. at 171–172):

> Although the remedy provided for in clause 11(c) namely, the recovery of excess costs, was lost by the defendant because of its tardiness in re-letting the contract, clause 11(f) tells us that "[t]he rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract."

> We think that this contract provision reserved to the defendant any common law remedies which it may have had, at the same time recognizing the right to assert claims for excess cost under clause 11(c). In point of fact, all that provision 11(c) does is to take a common law rule for determining damages for breach of contract, the difference between the contract price and the reasonable cost of obtaining performance after the breach, and say that if the Government repurchases within a reasonable time, the repurchase price will be accepted as the reasonable cost of obtaining performance with no further proof required.

Though the defendant may not now satisfy its burden of proving damages merely by showing what was the unit price on the re-letting of Contract 3833, we think that it should be given the opportunity to show, as a matter of common law contract damages, how much the cost of obtaining performance was increased as a result of the plaintiff's breach * * *.

 The administrative denial of excess costs accordingly left the government free to bring the present suit for damages for breach of contract.

Next, plaintiff urges a similar bar to the government's suit by reason of the proceedings in bankruptcy of the contractor, Firth. The failure of the trustee to allow the government's claim for excess costs is said to bar the claim made in this case. This argument was, however, necessarily rejected in the court's former decision, in 1957, holding the government's claim maintainable despite the bankruptcy proceedings. Marley v. United States, *supra.*

The government's right to maintain the instant suit is thus not affected by any prior or other proceedings.

 *The Issue of Breach.* In this suit the issue of plaintiff's breach has, as the government contends, already been determined. The Board has, in a decision upheld in Part I of this opinion, made findings of fact that plaintiff defaulted, without excuse, and that the contract was properly terminated for his default. These findings of fact, made in a proceeding over which the Board had jurisdiction, are entitled to final and binding weight in the instant litigation, though the issue here is breach of contract, a matter beyond the Board's jurisdiction. United States v. Utah Constr. & Mining Co., *supra*; Morrison-Knudsen Co. v. United States, *supra.* It remains only to add the almost inevitable conclusion of law—that an unexcused default is a breach. Rumley v. United States, *supra*, 285 F.2d at 776, 152 Ct.Cl. at 170. No relitigation or trial is necessary on the issue of breach. Partial summary judgment may be had on that issue.

 *The Issue of Damages.* The amount of the damages, however, has not been determined in any final or binding manner, and this issue must be tried.

It will be recalled that in the course of the decision holding defective the reprocurement in June 1957 at $16.1131, the Board noted that at about the time of the reprocurement the government awarded two other contracts for the same device, at prices substantially lower than $16.1131. The lower-priced of these two contracts was awarded in May of 1957, between the time of the termination for default on February 18, 1957, and the reprocurement on June 7, 1957. The unit price in this May contract was $9.8726, plus additional costs of tooling of $40,178. The costs of this contract are the basis of the demand by the contracting officer for damages of $93,029.06, and of the government's contentions now under consideration.

The computation of damages by the contracting officer was as follows: The difference, $3.1226, between the $9.8726 cost and the $6.75 cost in the defaulted contract, multiplied by the 17,007 units which plaintiff failed to deliver, or $53,-106.06, to which he added $40,178, the costs of special tooling in the May 1957 contract, less residual values of $255, or a net cost of tooling of $39,923, to arrive at a total of $93,029.06. The counterclaim prays for damages in this total; the government in one of its briefs suggests that summary judgment may be given at least for $53,106.06, which would represent an abandonment of the tooling costs.

Neither the decision of the Board nor any decision of the contracting officer provides final or binding administrative determinations on either amount claimed, $93,029.06 or $53,106.06. The contracting officer's demand for $93,029.06 has already been held to be a demand for damages and not a determination of a dispute. The Board decision was a decision on the facts of reprocurement in

June 1957, and not on market value at the time of breach in February 1957, or on damages for breach of contract.

The government claims that the Board's reference to the May award at $9.8726 is a finding which is entitled to finality in this suit on the issue of market value or damages by virtue of the same rule as gave final effect to the Board's decision on default and breach. An examination of the Board's decision does not bear out the contention. The May award at $9.8726 was utilized by the Board merely as confirmation that wider solicitation of suppliers might have generated bids lower than the $16.1131 relied upon as basis for an award of excess costs. The "Decision" portion of the opinion refers only to "two awards" at prices lower than $16.1131; the details of the May award, one of the two awards, appear earlier in the opinion, in the Board's statement of the facts. The Board could not have intended that its passing mention of the two other awards be a "decision" of fact within the meaning of the disputes clause and section 1 of the Wunderlich Act, 41 U.S.C. § 321. The Board did not have before it the question of damages for breach of contract or the principal element to damages, market value at the time of breach in February 1957. Its opinion shows that it did not consider or make findings on these matters.

The government's last contention is that if there is no finding, entitled to binding effect, of a market cost of $9.-8726, then the facts of the award at that price is evidence, in the administrative record before the court on this motion, on which summary judgment may be based. Rumley v. United States, *supra,* is cited as an instance where the court accepted evidence in a record, on the issue of contract damages, after the right to an award of excess costs had been lost. The citation is inapposite. The record referred to in *Rumley* was a record after trial, not an administrative record presented on a motion. The issue here is whether evidence in an administrative record may be a substitute for trial.

The breach, here, occurred in February 1957. The evidence of damages now put forward as conclusive is evidence of one or two awards of similar contracts in May 1957. This evidence came into the administrative record through a witness called by the Board to testify "concerning the reprocurement action on the Firth termination" and he was told that "The primary subject of your testimony is to be the procurement action." Breach of contract damages or market value was not the issue before the Board.

The evidence of the award in May 1957 was thus taken in another proceeding on another issue. Plaintiff has never had a hearing on breach damages, and certainly not a judicial hearing. Such evidence may not be made the basis of a summary, final judgment against plaintiff for a dollar amount, which would deprive him of a judicial hearing on the issue of whether the government suffered any damages from the breach and, if so, on the amount of any such damages. In this court, as in others, summary judgment is granted only on proof "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 64(d) [since September 1, 1969, Rule 101(d)]. Plaintiff's pleading and his motion papers sufficiently deny and put in issue all the facts material to damages. The denial is genuine enough, in view of the inadequate proof of damages presented by the government. On that proof, it plainly appears that the government is in the words of the Rule not "entitled to a judgment as a matter of law."

Accordingly, the government's motion for summary judgment should be denied, except to the extent already noted on the issues of breach and liability. Partial summary judgment should be entered under Rule 64(d), (e) [now Rule 101(d), (e)], adjudicating that plaintiff is as successor to the receiver and trustee of Firth liable, to the extent of amounts awarded plaintiff on his second cause of action, for breach of the contract by Firth, the amount of damages to

be determined on trial. The motion should in other respects be denied.

### III.

### Plaintiff's Second Cause of Action

Plaintiff's second cause of action is for a balance of $59,500 owed by the government on certain unrelated contracts, and for a sum of $50 at one time withheld by the government from certain payments to plaintiff, less a certain credit in favor of the government in the amount of $7,500, or a net amount of $52,050, all subject to a lien for the government's claims presently in suit.

The petition prays judgment for the net amount of $52,050. From the failure of the petition to challenge the credit of $7,500 and from the amount of the prayer, it appears that the propriety of the credit is conceded. A second credit claimed by the government, in the amount of $6,615.67, is, however, challenged. Plaintiff alleges that his agreement to this credit was obtained by economic duress and misrepresentation; moreover, that the government did not meet a certain condition subsequent to the agreement. The petition may be taken as an admission that an agreement was made, but that it was invalid.

The government's answer admits the original liability for $59,550, subject to the government's liens for its present claims against plaintiff; alleges the validity of agreements in writing by plaintiff to the credits of $7,500 and $6,615.67; denies the allegations of economic duress and misrepresentation in connection with the latter credit; and, finally, pleads a set-off in the amount of the claim for excess costs or breach of contract damages. The original balance of $59,550, less the two credits of $7,500 and $6,615.67, leaves a net liability of $45,434.33, subject to the government's set-off and counterclaim. The petition and the answer raise an issue as to the alleged duress and other invalidating factors in the agreement for the credit of $6,615.67.

The government has moved for summary judgment dismissing the second cause of action, on the sole ground that it is entitled to summary judgment, on its claim for excess costs or damages, in an amount larger than plaintiff can recover on his second cause of action. The denial, in Part II of this opinion, of the government's motion for summary judgment on its counterclaim therefore requires the denial of its motion to dismiss the plaintiff's second cause of action.

Plaintiff has moved for summary judgment for $59,500, on his second cause of action, subject to such set-off as the defendant may establish. The motion seems to overlook both the concession in the petition of the credit for $7,500, and the claim in the petition to the withheld sum of $50, conceded by the government's answer. The motion will be treated as a motion for judgment, in the amount prayed in the petition, $52,-050, subject to set-off in the amount the government may recover on its counterclaim. The motion must of course be denied, for the counterclaim has not yet been tried. Plaintiff is, however, entitled to a partial summary judgment on the portion of the claim conceded, $45,-434.33, subject to set-off to the extent of any amount recovered by the government on its counterclaim.

Trial of the plaintiff's second cause will be limited to the credit of $6,615.67. The issues will be the making of the written agreement for the credit, alleged by the government, and the exertion of duress and the failure of a condition subsequent, alleged by plaintiff.

### IV.

### The Government's Right to an Affirmative Judgment on the Counterclaim

Since the government, in its counterclaim, claims damages to a maximum of

$93,029.06 and a minimum of $53,106.-06, and the maximum recoverable by plaintiff on his second cause of action is $52,050, a question arises of the government's right to an affirmative judgment against plaintiff Marley, should the counterclaim be successful on trial. While decision could be postponed to the outcome of the trial, the question has been argued on this motion and its disposition now may assist the parties in the distribution of their further efforts in this aged case.

Plaintiff Marley is not liable to any affirmative judgment. He bought the claims of the original plaintiff, the receiver and trustee in bankruptcy of Firth Machine & Tool, Inc., at a judicial sale of the bankrupt's assets, held in 1965. Having succeeded to the interests of the receiver and trustee, Marley moved in this case to be substituted for him as the plaintiff. Without opposition by the government, the motion was granted and Marley became the sole plaintiff.

 Marley is entitled to the protection of the rule that an assignee of a chose in action is, in a suit against the obligor, subject to counterclaim for claims against the assignor only to the amount of the assigned claim. No affirmative judgment may be given against the assignee. He stands in the shoes of the assignor so far as defenses, including set-off, are concerned, but he is not the assignor and he is not personally liable for the assignor's debts. Restatement, Judgments, § 57, comment (a) and illustration 2 (1942); 80 C.J.S. Set-Off and Counterclaim p. 121. The counterclaim is permitted "not for the purpose of affirmative recovery over against the assignee, but for the purpose of establishing demands to offset, and thereby diminish, *pro tanto* the recovery by the assignee." Clark, Code Pleading § 106 at p. 681 (2d ed. 1947). Accordingly, in a suit in this court brought by an assignee of a claim, when the government proved a counter-claim for over $2 million based upon transactions with the assignor, recovery was permitted on the counterclaim only for the amount awarded to plaintiff, $248,375; that is, the counterclaim was limited to the function of a set-off. Hadden v. United States, 130 F.Supp. 610, 615–617, 131 Ct.Cl. 326, 333–337, 367–368, 373, 386 (1955) (Case No. 48867, findings of fact nos. 51–55, 68 and conclusion of law, 131 Ct.Cl. at 367–368, 373, 386).

These authorities are applicable where the assignee is not by reason of his own conduct personally liable to the counterclaim. The government claims that personal liability should here be imposed on Marley. He should be estopped, it is urged, to deny his liability to an affirmative judgment, because by substituting himself as sole plaintiff he caused the government to lose any other party that might be liable on the counterclaim. The argument, if adopted, would make it an actionable wrong to make an unopposed motion, for Marley did nothing more than move his substitution, making full disclosure of the documents relating to his succession to the trustee on the judicial sale. It would be more appropriate to estop the government. Its failure to oppose the motion was a statement of its willingness to assume any loss from the release of the trustee as a party and his departure from the case. Had the government objected to the motion, the trustee could have been retained as a party to answer to the counterclaim.

It is clear that the government lost little or nothing by the release of the trustee. A judgment against the trustee, in any amount greater than might be useful as a set-off against his claims, would be payable only on its proof in the bankruptcy proceedings, and then only in the percentage paid to creditors generally. The trustee was already, at the time of the substitution, selling assets and marshaling liens. The realization of any judgment against him on the counterclaim could not be expected for

years. It would surely come, if at all, too late to prove it in the bankruptcy court, as in Re Havens, 182 F. 367 (E.D. N.Y.1910).

With these considerations evident, the government's failure to object to Marley's substitution for the receiver and trustee was doubtless the result of a deliberate judgment that the loss of the right to an affirmative judgment, on the departure of the trustee, would not mean a loss in fact. With the contractor insolvent, the counterclaim was valuable for purposes of a set-off only.

No affirmative judgment against plaintiff Marley will, therefore, be possible on the trial of the counterclaim. Recovery on the counterclaim will serve only to reduce the amount found to be due to plaintiff.

## V.

### *The Government's Second Counterclaim*

A second counterclaim by the government in the amount of $880.23 was amended, in pretrial proceedings, to claim $797.65. Plaintiff's predecessor conceded liability for $757.06, leaving a balance in dispute of $40.59.

The motions made do not advert to the second counterclaim, and it is noted here only for the sake of a complete setting out of the issues which may require trial. Unless it appears that the government has waived the difference of $40.59, or that the parties have made an agreed disposition of the matter, the claim for this sum will be triable with the other issues. As in the case of the first counterclaim, no affirmative judgment will be granted. The government's recovery on both counterclaims may not exceed the total amount awarded to the plaintiff on his second cause of action.

## CONCLUSION

For the reasons stated:

1. Plaintiff's motion for summary judgment on the first cause of action, seeking review of the decision of the Armed Services Board of Contract Appeals, is denied, the government's motion for summary judgment granted, and the first cause of action dismissed.

2. Partial summary judgment is entered on plaintiff's second cause of action, adjudicating that defendant is liable to plaintiff in the sum of $45,434.33, subject to setoff in the amount awarded to the defendant, after trial, on its first and second counterclaims. In all other respects, the cross-motions for summary judgment concerning the second cause of action are denied.

3. Partial summary judgment is entered, on the government's motion for summary judgment on its first counterclaim and on its plea of set-off to plaintiff's second cause of action, adjudicating that the contract was breached by plaintiff's predecessor, Firth Machine & Tool, Inc., and that plaintiff is liable for damages, to the extent only of any amounts found to be due to him on the trial of his second cause of action, the damages to be determined in further proceedings, to begin after a period of 90 days; and the motion is denied in all other respects.