## K-Mart Corporation v. First Pennsylvania Bank

*Richard Unger,* for plaintiff.
*Miles Shore,* for defendant.


GAFNI, *J.,* June 18, 1980—In this action plaintiff K-Mart Corporation (K-Mart), is seeking to recover moneys held by defendant First Pennsylvania Bank (bank) as assignee of Penn State Mills (PSM), a bankrupt supplier of K-Mart.

The facts underlying this litigation, undisputed by the parties, are as follows. From time to time, K-Mart purchased merchandise from PSM for resale in K-Mart's stores. PSM would deliver the goods to individual K-Mart stores. Each store would then forward the invoices to K-Mart's headquarters for payment, together with vouchers which itemized deductions taken for defective merchandise. Since defects were frequently discovered only when a customer returned goods, these deduction vouchers were often processed after K-Mart had already paid PSM. As a result, the practice of the

parties was that K-Mart would deduct these credits from payments due on subsequent shipments.

In 1970 PSM assigned its accounts receivable to the bank, to which all future payments were to be made directly. From 1970 until 1977 K-Mart continued its prior practice of deducting credits due from subsequent invoices in determining the monthly sums owed to the bank. Neither PSM nor the bank ever objected to this procedure or to any credits taken by K-Mart.

In 1977 PSM was adjudicated bankrupt and ceased deliveries to K-Mart. Consequently, there was no "next" payment from which K-Mart could deduct $3,936.10 in credits due for rejected merchandise.

In March, 1978 K-Mart filed a complaint in assumpsit, demanding that the bank return overpayments of $3,936.10. The bank denied liability on the ground that, as assignee of PSM, it was not subject to K-Mart's claim.[1] The parties have now filed cross-motions for summary judgment.

The single issue here presented is whether an assignee (here, bank) with a security interest in accounts receivable may be liable to an account debtor (here, K-Mart) for overpayments resulting from the account debtor's rejection[2] of defective merchandise earlier supplied by a now bankrupt seller-assignor (here, PSM).

Plaintiff K-Mart argues that its contract with PSM expressly provided that the buyer could return

1. The matter was first litigated before a panel of arbitrators from whose decision this appeal was taken.

2. There is no contention that K-Mart's rejection of the goods was in any way improper. See Uniform Commercial Code, 13 Pa.C.S.A. §2601.

all nonconforming goods for credit.[3] Moreover, under section 2711 of the Uniform Commercial Code, 13 Pa.C.S.A. §2711, a buyer who has rightfully rejected goods may recover "so much of the price as had been paid." Accordingly, K-Mart had the right to recover sums earlier paid for defective merchandise from PSM.

K-Mart contends that this right to recover overpayments is not lost because of the assignment of accounts receivable, but rather, the assignee is equally liable to return such overpayments. Its position is supported by section 9318(1) of the Uniform Commercial Code, 13 Pa.C.S.A. §9318(a), which provides:

". . . Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 9206 . . . the rights of an assignee are subject to:

"(1) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom. . . ."

Neither party alleges that an agreement not to assert defenses or claims arising out of the contract between K-Mart and PSM exists. K-Mart concludes, therefore, that since the rights of the bank, as assignee, are subject to any defense or claim derived from the contract between K-Mart and PSM, the bank, no less than PSM, is required to return payments made for defective merchandise.

3. K-Mart's standard order contract stated: "[i]f goods are defective, unsuitable, do not meet buyer's specifications, or in any way do not conform to all terms of buyer's order, buyer may return such goods to seller for full credit and charge seller with incurred inbound and outbound freight, and handling, storage and inspection charge of 7½ percent of the goods' invoice price."

In support of its position, plaintiff cites only Investment Service Co. v. North Pacific Lumber Co., 261 Or. 43, 492 P. 2d 470 (1972), which held that, in a similar situation, the bank became indebted to the account debtor. Careful analysis of that case will reflect, however, that it holds only that the assignee-bank must allow a set-off against *future* payments for the amount overpaid. It does not deal with the responsibility of the assignee where future payments are not forthcoming.

Nonetheless, it is the opinion of this court that the position of K-Mart, as set forth in Firestone Tire & Rubber Co. v. Central National Bank, 159 Ohio St. 423, 112 N.E. 2d 636 (1953), represents the appropriate standard. The court there held that where the assignor fails to perform the contract, the assignee cannot retain mistaken, or even negligent payments made to it by the [debtor] unless there has been a subsequent change of position by the assignee.

Reference to this holding was made in Gilmore, "The Assignee of Contract Rights and His Precarious Security," 74 Yale L.J. 217, 235, fn. 35 (1964-65).

Moreover, research has revealed two more recent cases which support K-Mart's position. In Farmers Acceptance Corp. v. DeLozier, 178 Colo. 291, 496 P. 2d 1016 (1972), a subcontractor failed to complete a contract with his general contractor. The Supreme Court of Colorado held that the subcontractor's assignee was not entitled to retain payments made to it by the general contractor if the condition precedent to payment, performance of the underlying contract, had not occurred.

Similarly, in Benton State Bank v. Warren, 263 Ark. 1, 562 S.W. 2d 74 (1978), unpaid suppliers of

building materials sued the subcontractor and the owner/general contractor for moneys due them. The owner had made progress payments, which were intended to pay for materials, jointly to the subcontractor and his assignee bank.[4] The bank credited the money received against its outstanding loans to the subcontractor. The progress payments were made on the basis of false certifications by the subcontractor that all previous bills for labor and materials had been paid. The owner was ultimately required to pay for the labor and materials a second time when the subcontractor and his assignee bank.[4] The bank credited the money received against its outstanding loans to the subcontractor. The progress payments were made on the basis of false certifications by the subcontractor that all previous bills for labor and materials had been paid. The owner was ultimately required to pay for the labor and materials a second time when the subcontractor finally defaulted. The question presented to the court was whether the losses involved should be borne by the owner or by the bank, or, in other words, whether the owners were entitled to recover their earlier payments to the bank. The court found that the critical factor was the relative degree of fault of the parties. It held that although the general contractor had been retemiss in not verifying payment of the subcontractor's bills, the bank-assignee had ample reason to suspect that it was receiving payments which should have been used to pay for materials. The bank bore the greater fault, and, consequently, the risk of loss. The bank was, therefore, required to reimburse the owner/

4. An assignee can require an account debtor, upon proper notification, to draw checks jointly to the order of itself and its assignor: 13 Pa.C.S.A. §3116.

general contractor for the amount paid by it to satisfy the subcontractor's suppliers.

These two cases stand for the proposition that, in the appropriate circumstances, an assignee can be affirmatively required to return moneys held by it as a result of mistaken or negligent payment, as long as it has not changed its position adversely in reliance on moneys received.[5] This rule particularly applies when an assignee bears the greater responsibility for allowing improper overpayments to be made.

The bank argues, however, that such affirmative relief is barred, and that it should not be required to be the "deep pocket" for PSM, the bankrupt assignor. It cites several New York cases which hold that when a seller defaults, the purchaser has no claim against a factor who has a security interest in a seller's invoice, but must look instead to the seller for recompense. See Crompton-Richmond Co. v. Raylon Fabrics, Inc., 33 A.D. 2d 741, 305 N.Y.S. 2d 850 (1969); Iselin-Jefferson Financial Co. v. Makel Textiles, 21 A.D. 2d 758, 250 N.Y.S. 2d 299 (1964). These cases are of limited precedential value, however, as they arose in the somewhat specialized and ancient area of factoring, rather than under the Uniform Commercial Code. This court, for the reasons hereafter enunciated, is of the opinion that the rule to which reference has already been made, represents the fairer standard.

The bank claims that the risk of PSM's insolvency would have fallen on K-Mart absent the assignment, and that the assignment should not transfer the expected and assumed risks of the account

5. Whether the same result would or should obtain if there had been a subsequent change of position is not presented by this case.

debtor onto the shoulders of the assignee. However, K-Mart is not, in the opinion of this court, seeking to transfer its legitimate risks onto the bank. To be sure, as the purchaser, K-Mart assumed the risk that PSM would not perform its part of the contract properly;[6] it did not assume the risk that overpayments would be retained by the bank.

The bank had been on notice for over seven years that K-Mart generally deducted credits due from payments made for subsequent shipments of merchandise. Moreover, it was the bank, not K-Mart, which examined PSM's balance sheet and found it appropriate to make loans to a financially ailing company. The bank was in a far better position than K-Mart, a mere customer, to ascertain the financial stability of PSM, and to take these factors into account when loans were made, rates set, and security interests taken.[7] Of even greater importance to this court, however, is the fact that the bank continued to accept payments from K-Mart, knowing that they were subject to return should defects in the supplied merchandise later develop. In effect, the bank was fully aware that it was, in all likelihood, receiving amounts in excess of those to which it was entitled.

6. The clause cited at footnote 4, supra, was included to account for such an eventuality.

7. Such risks, of course, are part of all business transactions. However, a buyer of goods is rarely as concerned with the balance sheet of its supplier as a seller would be with that of a customer who is obligating himself to pay for a large quantity of expensive merchandise. Neither would a buyer have the same interest as a bank, which expects a sizeable loan to be repaid over a long period of time and must assure that the obligor will not default.

An analysis of comparable situations may best highlight the weakness of the bank's position. If, for example, K-Mart had, through simple clerical error, paid the bank $1,000 for PSM merchandise which had never been delivered or billed, all would agree that the bank should return this $1,000 to K-Mart; the result would not be affected by the fact that K-Mart would have been unable to recover that same amount had it been inadvertently paid to the bankrupt PSM rather than to the bank.

Similarly, if PSM had not become bankrupt, K-Mart would still have been entitled to seek the refund of overpayments for defective merchandise not only from PSM, but also from the bank under section 2711 of the Uniform Commercial Code.

In the instant case, for seven years payments were made by K-Mart to the bank with the full understanding by *both* parties that these payments were not final but were subject to subsequent adjustments when returns for defects or other reasons were determined. It is apparent to this court that merely because PSM is bankrupt and can no longer be expected to repay K-Mart, the bank may not now unilaterally ignore its prior understanding, which was clearly within the contemplation of the parties, and retain funds which should not have been paid to it initially. The bank received funds to which it was not entitled, i.e., for defective merchandise, and, consequently, fairness and logic, no less than the provisions of the Uniform Commercial Code previously cited, require that it return these funds to K-Mart.

Defendant bank has presented several other arguments in support of its position which this court finds to be without merit.

The bank contends that a "judgment on a counterclaim or set-off against an assignee, where based on a demand against an assignor, cannot be affirmative; it can be defensive only." St. Paul Insurance Co. v. Gentry, 340 So. 2d 442 (Miss. 1976). See also, Marley v. United States, 423 F. 2d 324 (Ct. Cl. 1970). Analysis of the cases cited by the bank will reflect that they are inapposite for they only bar set-offs and counterclaims *in excess* of the sums claimed by the assignee. The holding in the instant case, however, is that to the extent that certain overpayments are made to the assignee, that assignee, no less than the assignor, is required to return these overpayments. This holding will not result in an affirmative judgment in excess of the sums received by the bank under its assignment. Consequently, the rule against affirmative judgments does not apply in this situation.

Additionally, the bank asserts that it is allowed by section 9317 of the Uniform Commercial Code, 13 Pa.C.S.A. §9317, to keep K-Mart's overpayments. That section states:

"The mere existence of a security interest or authority given to the debtor to dispose of or use collateral does not impose contract or tort liability upon the secured party for the acts or omissions of the debtor."

Again, this section simply means that the bank cannot be held liable for damages sustained by K-Mart either in tort or contract actions by reason of the assignor's act or omisson. Thus, the bank could not be held liable for K-Mart's loss of profit or other contract damages by reason of the return of the defective merchandise; it would not be responsible for damages sustained because of physical injury

caused by a defect in goods supplied by PSM. However, K-Mart is not attempting to hold the bank liable for PSM's delivery of defective merchandise or for any resultant loss. It is merely asking that payments mistakenly made on account of that merchandise be returned to it. If PSM were still holding its own accounts receivable, it would be required to return moneys held by it as payment for goods subsequently rejected. Section 9318 of the Uniform Commercial Code specifically directs that the assignee, standing in its shoes, is subject to this same obligation.

Finally, defendant argues that the checks issued by K-Mart in payment of PSM's invoices were negotiable instruments, and that it took those checks free of all claims as a holder in due course. See 13 Pa.C.S.A. §3104. However, as earlier noted, section 9318 requires the bank to return overpayments held by it. Under Division 3 of the Uniform Commercial Code, the rights of a holder in due course are subject to the terms of Division 9: 13 Pa.C.S.A. §3103. The terms of a negotiable instrument are further subject to and may be modified by the terms of a written agreement which forms part of the same transaction, here the contract between K-Mart and PSM:[8] 13 Pa.C.S.A. §3119. Thus, although it is true that as a holder in due course, the bank could rightfully cash K-Mart's checks, it may not, as assignee, retain the overpayments.

For the reasons above stated, this court hereby grants plaintiff K-Mart's motion for summary judgment and denies defendant First Pennsylvania Bank's cross-motion for summary judgment.

---

8. See fn. 4, supra.

## ORDER

And now, June 18, 1980, it is hereby ordered that plaintiff's motion for summary judgment is granted and that defendant's cross-motion for summary judgment is denied.